UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PALISADES ESTATES EOM, LLC, NEWBURGH EOM LLC d/b/a CROSSROADS HOTEL, RATAN NEWBURGH LLC d/b/a RAMADA by WYNDHAM, SOUTH ROAD HOSPITALITY, LLC, HUDSON CONFERENCE CENTER, LLC, ROUTE 9 HOTEL LLC, SAI RAM MANAGEMENT LLC, SANDIP PATEL, RAPID RELIABLE TESTING NY LLC, AIMS NEWBURGH MANAGEMENT LLC, AIMS ORANGEBURGH MANAGEMENT LLC, CWP SYRACUSE I LLC, and ES ALBANY LLC, | Case No. 7:23-cv-04215 |
| Plaintiffs, | |
| v. | **SECOND AMENDED COMPLAINT** |
| COUNTY OF ROCKLAND, New York, EDWIN J. DAY, in his official capacity as County Executive of Rockland County, TOWN OF ORANGETOWN, New York, TERESA M. KENNY, in her official capacity as Town Supervisor of the Town of Orangetown, COUNTY OF ORANGE, New York, STEVEN M. NEUHAUS, in his official capacity as County Executive of Orange County, TOWN OF NEWBURGH, New York, GILBERT J. PIAQUADIO, in his official capacity as Town Supervisor of the Town of Newburgh, COUNTY OF DUTCHESS, New York, WILLIAM F.X. O'NEIL, in his official capacity as County Executive of Dutchess County, DUTCHESS COUNTY DEPARTMENT OF COMMUNITY AND FAMILY SERVICES, SABRINA J. MARZOUKA, in her official capacity as Commissioner of Dutchess County Department of Family Services, TOWN OF POUGHKEEPSIE, COUNTY OF RENSSELAER, New York, COUNTY OF HERKIMER, New York, COUNTY OF ONEIDA, New York, COUNTY OF BROOME, New York, COUNTY OF GENESEE, New York, COUNTY OF ORLEANS, New York, COUNTY OF SARATOGA, New York, COUNTY OF GREENE, New York, COUNTY OF SULLIVAN, New York, COUNTY OF ONONDAGA, New York, CHAUTAUQUA COUNTY, New York, FULTON COUNTY, New York, MADISON COUNTY, New York, NIAGARA COUNTY, New York, OSWEGO COUNTY, New York, OTSEGO COUNTY, New York, SCHOHARIE COUNTY, New York, SCHUYLER COUNTY, New York, SUFFOLK COUNTY, New York, TIOGA COUNTY, New York, WYOMING COUNTY, New York, MONROE COUNTY, New York, TOWN OF SALINA, New York, TOWN OF COLONIE, New York, and John Doe Counties and Municipalities 1-20, | |
| Defendants. | |

Plaintiffs Palisades Estates EOM, LLC ("Armoni"), Newburgh EOM LLC d/b/a Crossroads Hotel, ("Crossroads"), Ratan Newburgh LLC d/b/a Ramada by Wyndham ("Ramada"), South Road Hospitality, LLC ("South Road"), Hudson Conference Center, LLC ("Hudson Conference"), Route 9 Hotel LLC ("Route 9"), Sai Ram Management LLC ("Sai Ram"), Sandip Patel ("Patel"), Rapid Reliable Testing NY LLC ("RRT"), Aims Newburgh Management LLC ("Aims Newburgh"), Aims Orangeburgh Management LLC ("Aims Orangeburgh"), CWP Syracuse I LLC ("CWP Syracuse"), and ES Albany LLC ("ES Albany," and together with Armoni, Crossroads, Ramada, South Road, Hudson Conference, Route 9, Sai Ram, Sandip Patel, Aims Newburgh, Aims Orangeburgh, and CWP Syracuse, the "Plaintiff Hotels," and with RRT, collectively, the "Plaintiffs") hereby bring this Second Amended Complaint against Defendants County of Rockland, New York, and Edwin J. Day, in his official capacity as County Executive of Rockland County (together, "Rockland County"), County of Orange, New York, and Steven M. Neuhaus, in his official capacity as County Executive of Orange County ("Orange County"), the Town of Orangetown, New York, and Teresa M. Kenny, in her official capacity as Town Supervisor of the Town of Orangetown (together "Orangetown"), the Town of Newburgh, New York, Gilbert J. Piaquadio, in his official capacity as Town Supervisor of the Town of Newburgh (together, "Newburgh"), County of Dutchess, New York, William F.X. O'Neil, in his official capacity as County Executive of Dutchess County, Dutchess Department of Community and Family Services, Sabrina J. Marzouka, in her official capacity as Commissioner of the Dutchess County Department of Family Services (together, "Dutchess County"), Town of Poughkeepsie ("Poughkeepsie"), County of Rensselaer, New York ("Rensselaer County"), County of Herkimer, New York ("Herkimer County"), County of Oneida, New York ("Oneida County"), County of Broome, New York ("Broome County"), County of Genesee, New York ("Genesee County"),

County of Orleans, New York ("Orleans County"), County of Saratoga, New York ("Saratoga County"), County of Greene, New York ("Greene County"), County of Sullivan, New York ("Sullivan County"), County of Onondaga ("Onondaga County"), County of Chautauqua ("Chautauqua County"), County of Fulton ("Fulton County"), County of Madison ("Madison County"), County of Niagara ("Niagara County"), County of Oswego ("Oswego County"), County of Otsego ("Otsego County"), County of Schoharie ("Schoharie County"), County of Schuyler ("Schuyler County"), County of Suffolk ("Suffolk County"), County of Tioga ("Tioga County"), County of Wyoming ("Wyoming County"), County of Monroe ("Monroe County," and together with Rockland County, Orange County, Dutchess County, Rensselaer County, Herkimer County, Oneida County, Broome County, Genesee County, Orleans County, Saratoga County, Greene County, Sullivan County, Onondaga County, Chautauqua County, Fulton County, Madison County, Niagara County, Oswego County, Otsego County, Schoharie County, Schuyler County, Suffolk County, Tioga County, and Wyoming County, the "Counties"), Town of Salina ("Salina"), and Town of Colonie ("Colonie," and together with Orangetown, Newburgh, Poughkeepsie, and Salina, the "Towns," and with the Counties, collectively, "Defendants"), as well as against John Doe Counties and Municipalities 1-20 as additional unnamed Counties in New York and State Actors, allege upon information and belief as follows:

## NATURE OF ACTION AND GENERAL FACTUAL ALLEGATIONS

1.      Defendants through State Action have implemented an unconstitutional and discriminatory scheme to prevent Plaintiffs from providing temporary public accommodations in, and transportation to Plaintiffs' hotels for refugees seeking asylum and have impaired Plaintiffs' lawful agreements. In an effort to punish Plaintiffs and to intimidate others similarly inclined, Defendants have exceeded their power and authority and have targeted and retaliated against Plaintiffs in a

discriminatory and unlawful manner, simply for helping racial and ethnic minority refugees in a manner consistent with – and required by -- the U.S. Constitution and federal civil rights statutes.

2.      This case concerns largely, if not exclusively, refugees seeking asylum who are persons comprised of racial non-white minorities arriving from Latin American countries who have been entering the United States across its southern border with Texas, and apparently Florida (the "Asylum Refugees").

3.      Congress defines a "refugee" as "[a]ny person who is outside any country of such person's nationality ... who is unable or unwilling to return to, and is unable and unwilling to avail himself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* Immigration and Nationality Act of 2016, 8 U.S.C. § 1101(a)(42).

4.      Pending resolution of their asylum status, Asylum Refugees are lawfully present in the United States under federal U.S. Immigration law.

5.      The federal government has enunciated a national goal, as reflected in its immigration laws, to provide federal assistance and services to Asylum Refugees without regard to race, religion, nationality, sex or political opinion. *See*, *e.g.*, The Refugee Act, 8 U.S.C. Sec. 1522(a)(5); *Exodus Refugee Immigr., Inc. v. Pence*, 165 F. Supp. 3d 718 (S.D. Ind.), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

6.      In response to a growing humanitarian crisis concerning the Asylum Refugees, a federal national effort has been implemented by the U. S. Government and Department of Homeland Security ("DHS") to (1) increase the number of asylum seekers entering the US, and (2) transfer asylum seekers to other cities in the US. *See*, *e.g.*, https://www.collins.senate.gov/newsroom/senator-collins-urges-dhs-to-stop-exacerbating-asylum-seeker-housing-crisis-in-portland;

https://www.nbcnews.com/politics/immigration/border-surge-biden-admin-plans-send-migrants-cities-deeper-us-starting-rcna32530.

7.      In 2022, the State of Texas began sending groups of Asylum Refugees to New York City and other large cities.

8.      In the months preceding October 2022, nearly 20,000 Asylum Refugees arrived in New York City in need of housing and other services. Busloads of Asylum Refugees arrived at the Port Authority Bus Terminal at unpredictable hours and in need of basic services and shelter without prior coordination or consultation with New York City. This rapid influx has deeply taxed New York City, which currently hosts roughly 79,000 Asylum Refugees. *See* NYC Department of Homeless Services, Daily Report (May 11, 2023), *available at* https://perma.cc/J44R-E8WF.

9.       In October 2022, Mayor Eric Adams declared New York City was in a state of emergency, and New York City undertook to establish and operate temporary humanitarian relief centers, known as HERRCs (Humanitarian Emergency Response and Relief Centers) to provide emergency assistance for arriving Asylum Refugees by immediately offering temporary shelter, food, and medical care.

10.      However, New York City's capacity to provide temporary shelter – including in private hotels agreeing to rent rooms to Asylum Refugees – became strained as the number of people seeking shelter continues to rise to the highest level in recorded history.

    **A.**    **New York City Engages Plaintiff RRT to Enter into Lawful Agreements with Plaintiff Hotels to Address the Humanitarian Crisis**

11.      Pursuant to its contract with the City of New York, Plaintiff RRT provides Asylum Refugees with a suite of services including primarily temporary housing in public accommodations such as the participating hotel plaintiffs, as well as transportation to and from the hotels.

12.     Pursuant to its lawful contractual obligations with New York City, RRT has identified and engaged hotels throughout the state of New York to provide temporary public accommodations to Asylum Refugees, without regard to race, color, national origin or alienage, consistent with Plaintiffs' obligations under federal law, including but not limited to Title II of the 1964 Civil Rights Act, 42 U.S.C. sections 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

13.     As part of this arrangement, RRT is also responsible for ensuring that the Asylum Refugees who voluntarily accept temporary public accommodations with the Plaintiff Hotels also have access to essential services, including food, medical care, and social services. The hotel rooms and services provided to Asylum Refugees are paid for by New York City. RRT also connects Asylum Refugees with local organizations who provide English language courses, access to legal services, and assistance with obtaining work authorization permits.

14.     The Plaintiff Hotels are among the hotels that have agreed to provide temporary public accommodations to the Asylum Refugees, by and through RRT.

   **B.     In Response, the Defendant Counties, Working Hand-in-Hand
            with Each Other and Local Towns, Engage in a Pattern of
            Discriminatory Retaliation Through State Action**

15.     In response to Plaintiffs' lawful agreements to provide temporary public accommodations and transportation to and from, the defendant Counties, working hand and in hand with each other and local towns, have engaged in a pattern of discriminatory retaliation through State Action. The Counties have issued executive orders (the "Executive Orders") and taken other actions through their County Executives, Boards of Supervisors, County legislatures and local towns and municipalities, that unlawfully, impermissibly, and unconstitutionally prohibit – both on their face, and as applied through the discriminatory and pretextual enforcement of local laws

6

– Plaintiffs from performing their obligations to transport and offer temporary public accommodations to the Asylum Refugees in the Defendant Counties and Towns. Copies of the Executive Orders issued by all Defendant Counties are annexed hereto as **Exhibit A**.

16.     The Towns (including the towns of Orangetown, Newburgh, Poughkeepsie, Salina, and Colonie), in coordination with the Counties, and/or independently, have taken actions to further effectuate the unlawful and unconstitutional purposes of the Executive Orders, including through the discriminatory and pretextual enforcement of local zoning and building codes.

17.     Defendants have made clear their reasons are not noble but are unlawful and reek of discrimination. Indeed, as set forth in detail below, many of the local executives associated with the Counties and Towns have made discriminatory remarks in connection with the issuance and enforcement of their respective unconstitutional executive orders, including but not limited to:

   A.   For example, in a radio interview discussing the prospect of Asylum Refugees being accommodated in Rockland County, Rockland County Executive Ed Day said "[w]ithin that cadre of people who are coming here, who are not vetted, we have child rapists, we have criminals, we have people who are MS-13." *See 'Rockland County exec warns cops are 'deployed' if NYC tries to bus migrants there,'* New York Post, (May 7, 2023) available at: https://nypost.com/2023/05/07/rockland-county-exec-warns-cops-are-deployed-if-nyc-tries-to-bus-migrants-there/. Addressing Mayor Adams' Humanitarian Program, he said "here is my response … Mr. Adams, you can try to run us over [and] I will reach up and grab you by the throat for the people of Rockland County…You are not getting away with this." *Id.*

B. In another instance, Orange County Executive Steve Neuhaus stated "[r]ight now we have no idea who these people are. We have no idea what their backgrounds are." He further questioned "Are they criminals?" *See 'Mixed reactions in Orange County following news of asylum seekers' upcoming arrival,'* ABC 7 (May 9, 2023), available at: https://abc7ny.com/orange-county-asylum-seekers-ny-new-york/13228007/. He further lamented "What are these individuals going to do?" and declared "I am opposed to these asylum seekers being sent to our communities." *See 'Orange County declares state of emergency in response to NYC plan to bus asylum seekers to Newburgh,'* News 12 Hudson Valley (May 8, 2023), available at: https://hudsonvalley.news12.com/orange-county-declares-state-of-emergency-in-response-to-nyc-plan-to-bus-asylum-seekers-to-newburgh.

C. Similarly, discussing Salina's legal action designed at preventing the accommodation of Asylum Refugees within its borders, Salina's Town Supervisor, Nick Paro, said: "Our residents fear what will happen to their neighborhood if one, or two, or ten buses of illegal migrants roll into our town." *See 'Town of Salina Supervisor says NYC reached out about migrants coming to CNY,'* CNY Central (May 21, 2023), available at: https://cnycentral.com/news/local/town-of-salina-supervisor-says-nyc-reached-out-about-migrants-coming. Doubling down in another interview, Town Supervisor Paro declared that Salina would "fight back against … becoming New York City's dumping ground for their illegal migrant problem." *See 'New York City alerts Town of Salina Supervisor first bus of migrants headed to Onondaga County,'* Local SYR (May 21, 2023), available at:

https://www.localsyr.com/news/new-york-city-alerts-town-of-salina-supervisor-first-bus-of-migrants-headed-to-onondaga-county/.

18.     As a result, the Plaintiff Hotels who have agreed to provide Asylum Refugees with temporary public accommodations are being aggressively and illegally targeted and sued by Defendants which have a simple message: if you provide temporary hotel rooms to Asylum Refugees, Defendants will prevent performance of your agreements and destroy your businesses, all in flagrant violation of your constitutional and federal rights.

19.     For example, the County of Onondaga and the Town of Salina have engaged in unlawful intimidation, and threatening acts in violation of Plaintiffs' rights, without limitation, under 1) Title II of the 1964 Civil Rights Acts, sections 201, 202, and 203 without limitation; 2) the Fourth and Fourteenth Amendments to the U.S. Constitution, and 3) 42 U.S.C. secs. 1981 and 1983 by, *inter alia,* on June 14, 2023 orchestrating a raid of Plaintiff CWP Syracuse's Hotel in the Town of Salina, with the aid of the County of Onondaga Attorney's Office, including Nick Kleist, the Chief Confidential Assistant to the County Attorney and a former police officer with over 35 years of experience, where over a dozen Onondaga and Salina officials surrounded and entered the hotel to conduct warrantless searches of rooms in violation of its constitutional and federal statutory rights. *See* **Exhibit L**.

20.     Indeed, Defendants have engaged in a concerted discriminatory campaign to sway popular and national opinion against Plaintiff Hotels. In one instance, County Executive Neuhaus spread a false and defamatory narrative on national television to the effect that Plaintiff Crossroads evicted homeless veterans in order to accommodate the Asylum Refugees, leading to harassment and even death threats against Crossroads and its staff.

21.     Although this story has since been found to be completely fabricated, Mr. Neuhaus has failed to correct his defamatory statements.

22.   Thus, in immediate response to Plaintiffs' lawful agreements to provide temporary public accommodations and transportation to the Asylum Refugees, and in an effort to tortiously interfere with Plaintiffs' lawful agreements with New York City and Plaintiff hotels, many Defendants commenced separate actions in the New York Supreme Court and obtained temporary restraining orders ("TROs") enjoining Plaintiffs from transporting and/or temporarily housing Asylum Refugees, in plain violation of federal civil rights statutes and the U.S. Constitution.

23.     In addition, many Defendants have taken actions to harass and intimidate Plaintiff Hotels, seeking to damage and destroy their businesses for their willingness to provide temporary public accommodations to Asylum Refugees.

24.     For example, Rockland County has wrongfully refused to renew Armoni's temporary residence permit in furtherance of the unconstitutional goals set forth in the Rockland County Executive Order, thereby preventing Armoni from continuing to operate as a hotel.

25.     Defendants are actively using the state court apparatus to selectively prosecute and enforce with discriminatory intent and impact otherwise facially-neutral zoning laws, in furtherance of an unconstitutional scheme and in violation of federal civil rights statutes.

26.     Indeed, on June 6, 2023, the Rockland County and Orange County Executive Orders were deemed substantially likely to be unlawful under 42 U.S.C. § 1981 and Title II of the Civil Rights Act of 1964 and unconstitutional under the Due Process Clause and Equal Protection Clause of the United States Constitution. See the related case of *Deide v. Day*, No. 23-CV-3954 (NSR), 2023 WL 3842694 (S.D.N.Y. June 6, 2023). The remaining Executive Orders, and the manner in which they are enforced, including through the selective, pretextual and discriminatory

enforcement of local zoning codes, track the discriminatory intent of the Rockland and Orange

County Executive Orders and are similarly unconstitutional and unlawful, as set forth in detail

below. As with the Rockland County Order and the Orange County Order, each and every Executive

Order passed by a Defendant County – as well as each and every action detailed herein taken by a

Defendant County or Town – discriminates on the basis of race, ethnicity, national origin, alienage,

and immigration status of the Asylum Refugees.

27.     Indeed, the Defendant Counties and Towns have unlawfully conspired and

cooperated by and amongst themselves to achieve the unconstitutional scheme and injuries

complained of herein.

**THE EXECUTIVE ORDERS VIOLATE THE CIVIL RIGHTS STATUTES OF THE UNITED STATES, ARE FACIALLY UNCONSTITUTIONAL, AND ARE UNCONSTITUTIONAL AS APPLIED THROUGH SELECTIVE DISCRIMINATORY ENFORCEMENT OF FACIALLY-NEUTRAL LOCAL ZONING LAWS**

28.     Defendants are State actors that have unconstitutionally and unlawfully interfered

with Plaintiffs' legal rights and obligations – through both facially unconstitutional County

Executive Orders and as-applied facially neutral local laws – under, *inter alia*, the Contracts Clause

of the United States Constitution (the "Constitution"), Title II of the 1964 Civil Rights Act ("Title

II"), 42 U.S.C. Sections 1981 and 1983, ("1981" and "1983"), the Fourteenth Amendment Due

Process and Equal Protection Clauses, and the Fourth and Fifth Amendments to the Constitution, by

a) directly enforcing County Executive Orders; and/or b) selectively prosecuting and enforcing

facially-neutral zoning laws, with discriminatory intent and impact.

29.     As a direct result of Defendants' conduct alleged herein, by and through

promulgating and enforcing their Executive Orders, and/or by selectively prosecuting and enforcing

facially-neutral local laws including zoning laws with discriminatory intent and impact, Plaintiffs

have suffered actual, direct, concrete, and particularized harm and injury by, *inter alia*, being unable

to 1) perform their obligations and 2) conduct their business of making their hotel public accommodations freely available to the Asylum Refugees without regard to race, color, national origin and alienage – consistent with federal law. The injury suffered and complained of by Plaintiffs is directly traceable to Defendants' actions alleged herein, and there is no doubt that said injury will be redressed by a favorable decision by this Court.

30.     In addition to Plaintiffs' direct standing to bring these claims and actions, Plaintiffs have third party standing to assert the concomitant rights of third parties such as the Asylum Refugees, because as in *Craig v. Boren*, 429 U.S. 190, at 194-97 (1976), the legal duties created by Defendants' Executive Orders, and Defendants' discriminatory enforcement of facially-neutral zoning laws in furtherance thereof, "are addressed directly to vendors such as [Plaintiffs]. [Plaintiffs] are obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of [Plaintiff's] market, or disobey the statutory command and suffer…" *Id*.

31.     Thus, in addition to the direct standing of Plaintiffs to bring these claims and actions, Plaintiffs have third-party standing to raise equal protection challenges to Defendants' conduct alleged herein as discriminatory and unconstitutional. *Id*., *see also*, *Exodus Refugee Immigr. Supra,* 165 F. Supp. 3d at 729-33, *aff'd*, 838 F.3d 902 (7th Cir. 2016); *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1037-44 (11th Cir. 2008).

32.     Article 1, section 10, cl. 1 of the Constitution provides, *inter alia*, that "No State shall…. pass any …. Law impairing the Obligation of Contracts…".

33.     Defendants, by and through the Executive Orders, impermissibly impair and purport to render unlawful Plaintiffs' agreements, and performance thereof, as relates to providing temporary public accommodations and transportation for the Asylum Refugees to and from their hotels in Defendants' respective counties.

34.     Plaintiffs admit that the operation of their hotels bring them within the provisions of Title II, 1981, 1983, as well as under the Equal Protection and Due Process clauses of the Fourteenth Amendment.

35.     Title II obligates Plaintiffs to, *inter alia*, make their public accommodations freely available to the Asylum Refugees, without regard to race, color, national origin, or alienage.

36.     1981 prohibits discrimination in the making and enforcement of private contracts.

37.     1983 protects Plaintiffs' civil and constitutional rights against discriminatory conduct and laws by and through State Actors, including state or local government officials and entities such as Defendants.

38.     Defendants' Executive Orders are unconstitutional, both on their face and as applied through Defendants' selective discriminatory prosecution and enforcement of facially-neutral zoning laws, under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution, as they unlawfully prohibit Plaintiffs from transporting and providing temporary public accommodations to Asylum Refugees.

39.     Moreover, by enforcing the Executive Orders against Plaintiffs, either directly, or indirectly through selective discriminatory enforcement of zoning laws, on the basis of the race, national origin, alienage and/or immigration status of Asylum Refugees, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment.

40.     Many of the Executive Orders on their face are directed at restricting the ability of the Asylum Refugees to seek transport and temporary housing within the Counties. In doing so, the Executive Orders improperly conflict with the federal government's preeminence over its policies to provide temporary public accommodations and services for Asylum Refugees.

41.     Although the County Executive Orders are unconstitutional on their face, several state courts have granted TROs and preliminary injunctions enforcing Defendants' Executive Orders and/or Defendants' selective discriminatory prosecution and enforcement of facially-neutral zoning laws, prohibiting Plaintiffs from transporting or providing temporary public accommodations to Asylum Refugees in several Defendant Counties.

42.     For example, on May 12, 2023, the Rockland County Supreme Court granted Rockland County's request for a TRO enforcing the Rockland County Executive Order prohibiting Plaintiff Armoni[1] from transporting or providing temporary lodging to any Asylum Refugees in Rockland County. A copy of all TROs which have been issued in New York State Supreme Court in connection with actions brought by any Defendant against any Plaintiff pertaining to the transportation and accommodation of Asylum Refugees is annexed hereto as **Exhibit B.**

43.     Subsequently, a Justice of the Rockland County Supreme Court issued a preliminary injunction prohibiting Plaintiff Armoni from accommodating Asylum Refugees, relying on local zoning laws. Additionally, a Justice of the Orange County Supreme Court granted a preliminary injunction against Plaintiffs Crossroads and Ramada, prohibiting the Hotels, along with the City of New York, from transporting or providing temporary lodging to Asylum Refugees in Orange County. A copy of the Preliminary Injunctions which have been issued in Rockland County Supreme Court and Orange County Supreme Court is annexed hereto as **Exhibit C**.

**THE DEFENDANTS' AS APPLIED CONDUCT – SELECTIVE DISCRIMINATORY PROSECUTION AND ENFORCEMENT OF FACIALLY-NEUTRAL LOCAL LAWS INCLUDING ZONING LAWS – IS UNCONSTITUTIONAL**

44.     In furtherance of the discriminatory policy objectives both expressly and implicitly set forth in Defendants' Executive Orders, the local townships within the Counties have – in

---

[1] Plaintiff Armoni, as well as the other Hotel Plaintiffs, are not involved with the transportation of the Asylum Refugees, which is handled by RRT.

coordination with County officials – begun to selectively prosecute and enforce, with discriminatory intent, facially-neutral local laws and ordinances, including but not limited to zoning and building codes, in violation of Plaintiff's federal and constitutional rights. *See, e.g.,* **Exhibit D, (the "Orangetown Complaint").**

45.    For example, Orangetown commenced an action against Armoni expressly relying on the unlawful Executive Order issued by Rockland County, stating the Armoni Hotel is being used unlawfully because it does not comply with the Rockland County Executive Order. Officials of Rockland County and Orangetown have openly discussed their joint efforts, holding multiple joint press conferences about their dual approach to ensure Rockland County can block Plaintiffs.

46.    In the same vein, Rockland County is using its licensing authority to withhold a temporary residence permit – which Armoni requires in order to operate – because Armoni has an agreement to provide temporary accommodations to Asylum Refugees. As a result of Rockland County's refusal to issue the permit, Armoni was forced to shut down, kick out existing guests (who were not Asylum Refugees), and cancel all future reservations (*i.e.*, reservations of non-Asylum Refugee guests).

47.    In addition, other Defendants, including without limitation Newburgh and Orange County, are selectively targeting and enforcing facially-neutral local codes, with discriminatory intent and impact, against participating Plaintiff Hotels, including Crossroads and Ramada, to prohibit Plaintiffs from transporting and providing temporary public accommodations to Asylum Refugees, often expressly relying upon the unlawful policies set forth in the unconstitutional Executive Orders. *See, e.g.,* Complaint filed by Newburgh in the Supreme Court, Orange County (the "Newburgh Complaint"), a copy of which is annexed hereto as **Exhibit E**.

48.     As one example, Paragraph 23 of the Newburgh's state court complaint cites to the Orange County Executive Order in furtherance of applying local zoning and municipal codes to achieve its unconstitutional and discriminatory purposes.

49.     Similar constitutionally impermissible conduct has been employed against Plaintiffs by virtually all of the Towns and several of the Counties.

50.     Defendants' conduct alleged herein violate Plaintiff's constitutional and federal rights while at the same time discriminates against the Asylum Refugees on the basis of race, national origin, alienage, and immigration status.

## THE EXECUTIVE ORDERS ARE CONFLICT-PREEMPTED UNDER THE SUPREMACY CLAUSE

51.     The Asylum Refugees are lawfully present in the United States as they await determination of their asylum refugee status. States and localities have no power to enact or enforce regulations which conflict with federal law concerning restrictions on the ability to provide housing of aliens in the United States or restrictions on their movements, as set forth in, inter alia, 8 U.S.C. § 1324(a). *See Lozano v. City of Hazleton*, 724 F.3d 297, 315-17 (3d Cir. 2013)

52.     In *Lozano,* the Third Circuit observed that the Immigration and Nationality Act of 2106 is centrally concerned with 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully admitted.'" *Id.* (quoting *De Canas,* 424 U.S. 351, 359 (1976)). The INA's comprehensive scheme "plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status." *Lozano*, 724 F.3d at 315 (quoting *De Canas,* 424 U.S. at 359).

53.     The Third Circuit observed that "a number of courts have concluded that state or local laws proscribing the harboring of aliens lacking lawful status" are unenforceable. *Id.* at 316 (citing *Ga. Latino Alliance for Human Rights v. Governor of Ga.,* 691 F.3d 1250, 1263–65 (11th

16

Cir. 2012) ("*GLAHR*"); *United States v. Alabama,* 691 F.3d 1269, 1285–87 (11th Cir. 2012), *cert. denied,* 569 U.S. 968 (2013); *United States v. South Carolina,* 906 F. Supp. 2d 463, 468 (D.S.C. 2012), *aff'd*, 720 F.3d 518 (Fourth Cir. 2013); *Valle del Sol v. Whiting,* No. 10–1061-PHX-SRB, 2012 WL 8021265, at *5 (D. Ariz. Sept. 5, 2012)).

54.     The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.

55.     Thus, a state enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

56.     The County Executive Orders, as well as the discriminatory application of local laws, violate the Supremacy Clause and are preempted because, *inter alia*, they infringe on the federal government's ability to regulate the presence or housing of aliens in the United States.

**THE EXECUTIVE ORDERS, ON THEIR FACE AND AS APPLIED,
VIOLATE THE DUE PROCESS CLAUSE AND EQUAL PROTECTION CLAUSE
OF THE FOURTEENTH AMENDMENT**

57.     Moreover, the Executive Orders, both on their face and as applied by Defendants through discriminatory prosecution and enforcement of local zoning ordinances, impermissibly discriminate against the Plaintiff Hotels and Plaintiff RRT by restraining and prohibiting them from providing temporary public accommodations and transportation to and therefrom, on the basis of race, national origin, alienage, and immigration status of Plaintiffs' hotel guests and clients.

58.     Defendants' Executive Orders, and Defendants' discriminatory selective prosecution and enforcement of facially-neutral local codes, violate Plaintiffs' due process and equal protection rights under the Fourteenth Amendment of the United States Constitution, which also protects against discrimination on the basis of immigration status.

59.     In addition to Defendants' constitutionally impermissible discrimination based on race and national origin, Defendants unlawfully discriminate on the basis of the alienage and immigration status of the Asylum Refugees. That is plainly unlawful. *See Dandamudi v. Tisch*, 686 F.3d 66, 74 (2d Cir. 2012) ("On appeal, New York asks us to abrogate the Supreme Court's general rule that state statutes that discriminate based on alienage are subject to strict scrutiny review. The state argues that the statute at issue here, which discriminates against nonimmigrant aliens should be reviewed only to determine if there is a rational basis that supports it. In our view, however, a state statute that discriminates against aliens who have been lawfully admitted to reside and work in the United States should be viewed in the same light under the Equal Protection Clause as one which discriminates against aliens who enjoy the right to reside here permanently. Applying strict scrutiny, therefore, and finding, as the state concedes, that there are no compelling reasons for the statute's discrimination based on alienage, we hold the New York statute to be unconstitutional. We affirm the district court's grant of summary judgment for plaintiffs … Thus, statutes that deny opportunities or benefits to aliens are subject to strict scrutiny unless they fall within two narrow exceptions" - exclusions related to political and government functions, and matters directed at undocumented aliens.").

60.     Notwithstanding that the County Executive Orders are unconstitutional as applied, including by and through and Defendants' selective discriminatory prosecution and enforcement of local laws, the Rockland County Supreme Court granted Orangetown's request for a preliminary

injunction enforcing the Rockland County Executive Order prohibiting Plaintiffs Armoni and RRT from transporting or providing temporary lodging to any Asylum Refugees in Orangetown and effectively continuing Orangetown's discriminatory enforcement of its local zoning codes in furtherance of the Rockland County Executive Order. *See* **Exhibit C**.

61.     Plaintiffs – who have either contracted with the City of New York to identify and place Asylum Refugees in hotel rooms or have otherwise agreed to rent their hotel rooms to temporarily accommodate Asylum Refugees – therefore seek a declaration that Defendants' 1) Executive Orders on their face; and 2) selective prosecution and enforcement of local zoning and building codes evincing discriminatory intent, purpose or impact, are unconstitutional.

## THE PARTIES

62.     Plaintiff Armoni is a limited liability company organized under the laws of the State of New York with a principal place of business at 329 Route 303, Orangeburg, New York. Armoni is the owner of the Hotel known as Armoni Inn & Suites.

63.     Plaintiff Crossroads is a limited liability company organized under the laws of the State of New York with a principal place of business at 5 Lakeside Drive, Newburgh, New York. Crossroads is the owner of the Hotel known as the Crossroads Hotel.

64.     Plaintiff Ramada is a limited lability company which owns and/or operates a hotel in Newburgh, New York.

65.     Plaintiff South Road is a limited liability company organized under the laws of the State of New York with a principal place of business at 2349 South Road, Poughkeepsie, New York.

66.     Plaintiff Hudson Conference is a limited liability company organized under the laws of the State of New York with a principal place of business at 2170 South Road, Poughkeepsie, New York.

67.     Plaintiff Route 9 is a limited liability company organized under the laws of the State of New York with a principal place of business at 2349 South Road, Poughkeepsie, New York.

68.     Plaintiff Sai Ram is a limited liability company organized under the laws of the State of New York with a principal place of business at 2170 South Road, Poughkeepsie, New York.

69.     Plaintiff Patel is an individual residing in the State of New Jersey.

70.     Plaintiff RRT is a limited liability company organized under the laws of the State of New York with a principal place of business at 35 West 35th Street, 6th Floor, New York, NY 10001.

71.     Plaintiff Aims Newburgh is a limited liability company organized under the laws of the State of New York with a principal place of business at 5 Lakeside Drive, Newburgh, New York. Aims Newburgh is the operator of the Crossroads Hotel in Newburgh.

72.     Plaintiff Aims Orangeburg is a limited liability company organized under the laws of the State of New York with a principal place of business at 329 Route 303, Orangeburg, New York. Aims Orangeburg is the operator of the Armoni Inn & Suites in Orangeburg.

73.     Plaintiff CWP Syracuse is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 198 Ocean Ave., Woodmere, NY 11598. CWP Syracuse is the owner of the Hotel known as the Candlewood Suites Syracuse Airport.

74.     Plaintiff ES Albany is a limited liability company organized under the laws of the State of New York with a principal place of business at 200 Wolf Rd, Albany, NY, United States,

12205. ES Albany is the owner of the Hotel known as Surestay Plus by Best Western in the Defendant Town of Colonie.

75.     Upon information and belief, defendant County of Rockland is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 11 New Hempstead Road, New City, New York.

76.     Defendant Edwin J. Day is the County Executive of Defendant County of Rockland and is being sued in his official capacity.

77.     Upon information and belief, defendant County of Orange is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 255 Main Street, Goshen, New York.

78.     Defendant Steven M. Neuhaus is the County Executive of Defendant County of Orange and is being sued in his official capacity.

79.     Upon information and belief, defendant Orangetown is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 26 Orangeburg Road, Orangeburg (Rockland County), New York.

80.     Defendant Teresa M. Kenny is the Town Supervisor of Defendant Town of Orangetown and is being sued in her official capacity.

81.     Upon information and belief, defendant Town of Newburgh is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 83 Broadway, Newburgh, New York.

82.     Defendant Gilbert J. Piaquadio is the Town Supervisor of Defendant Town of Newburgh and is being sued in his official capacity.

83.     Upon information and belief, defendant County of Dutchess is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 22 Market Street, Poughkeepsie, New York.

84.     Defendant William F.X. O'Neil is the County Executive of Dutchess County and is being sued in his official capacity.

85.     Upon information and belief, defendant Dutchess Department of Community and Family Services is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 60 Market Street, Poughkeepsie, New York.

86.     Defendant Sabrina J. Marzouka, is the Commissioner of the Dutchess County Department of Family Services and is being sued in her official capacity.

87.     Upon information and belief, defendant Poughkeepsie is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 62 Civic Center Plaza, Poughkeepsie, New York.

88.     Upon information and belief, defendant County of Rensselaer is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 99 Troy Road, East Greenbush, New York.

89.     Upon information and belief, defendant County of Herkimer is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 109 Mary Street, Herkimer, New York.

90.     Upon information and belief, defendant County of Oneida is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 800 Park Avenue, Utica, New York.

91.      Upon information and belief, defendant County of Broome is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 60 Hawley Street, Binghamton, New York.

92.      Upon information and belief, defendant County of Genesee is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 7 Main Street, Batavia, New York.

93.      Upon information and belief, defendant County of Orleans is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 14016 Route 31 West, Albion, New York.

94.      Upon information and belief, defendant County of Saratoga is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 40 McMaster Street, Ballston Spa, New York.

95.      Upon information and belief, defendant County of Greene is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 411 Main Street, Catskill, New York.

96.      Upon information and belief, defendant County of Sullivan is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 100 North Street, Monticello, New York.

97.      Upon information and belief, defendant County of Onondaga is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 421 Montgomery Street, Syracuse, New York.

98.     Upon information and belief, defendant County of Chautauqua is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 3 Erie Streety, Mayville, New York.

99.     Upon information and belief, defendant County of Fulton is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 223 West Main Street, Johnston, New York.

100.     Upon information and belief, defendant County of Madison is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 138 N. Court St., Wampsville, New York.

101.     Upon information and belief, defendant County of Niagara is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 175 Hawley Street, Lockport, New York.

102.     Upon information and belief, defendant County of Oswego is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 46 East Bridge Street, Oswego, New York.

103.     Upon information and belief, defendant County of Otsego is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 197 Main Street, Cooperstown, New York.

104.     Upon information and belief, defendant County of Schoharie is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 284 Main Street, Schoharie, New York.

105.    Upon information and belief, defendant County of Schuyler is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 105 Ninth Street, Watkins Glen, New York.

106.    Upon information and belief, defendant County of Suffolk is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 100 Veterans Memorial Highway, Hauppauge, New York.

107.    Upon information and belief, defendant County of Tioga is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 56 Main Street, Owego, New York.

108.    Upon information and belief, defendant County of Wyoming is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 134 N. Main Street, Warsaw, New York.

109.    Upon information and belief, defendant County of Monroe is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 39 W. Main Street, Rochester, New York.

110.    Upon information and belief, defendant Town of Salina is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 201 School Road, Liverpool, New York.

111.    Upon information and belief, defendant Town of Colonie is a municipal corporation organized under the laws of the State of New York, with a principal place of business at 534 New Loudon Road, Latham, New York.

112.    Upon information and belief, Defendants John Doe Counties and Municipalities 1-20, include additional State Actors, including townships and counties in New York, which have

made executive orders that violate Plaintiffs' rights under the U.S. Constitution and federal law, or sought to enforce facially-neutral local ordinances with discriminatory intent and impact, but the identity of which have not yet become adequately known to Plaintiffs and for which Plaintiffs reserve their right to name and sue in this Action by way of amendment.

## JURISDICTION AND VENUE

113.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 1343, and Plaintiff seeks remedies under 28 U.S.C. §§ 1651, 2283, 2201 and 2202, without limitation.

114.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) & (c), in that the claims arise in this judicial district, and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this juridical district.

## FURTHER FACTUAL ALLEGATIONS

**A.    Asylum Refugees Enter the United States and
Are then Shipped to New York City**

115.    Asylum Refugees, largely from Latin American countries, have been entering the United States through its southern border.

116.    In response to a growing humanitarian crisis concerning the Asylum Refugees, a federal national effort has been implemented by the U. S. Government and Department of Homeland Security ("DHS") to (1) increase the number of asylum seekers entering the US, and (2) transfer asylum seekers to other cities in the US.

117.    The federal government has also enunciated a national goal, as reflected in its immigration laws, to provide federal assistance and services to Asylum Refugees without regard

to race, religion, nationality, sex, or political opinion. *See*, *e.g.*, The Refugee Act, 8 U.S.C. Sec. 1522(a)(5).

118.    Despite this, the State of Texas began sending groups of Asylum Refugees to New York City.

119.    New York City, consistent with this Nation's federal efforts, has provided temporary services to Asylum Refugees through the City's Department of Homeless Services ("DHS"), as well as private businesses such as Plaintiffs RRT and the Hotels, which include temporary accommodations and transportation.

120.    The number of Asylum Refugees arriving in New York City has ballooned, with over 79,000 Asylum Refugees arriving in New York City.

121.    On May 5, 2023, Mayor Adams announced a humanitarian program (the "Humanitarian Program") to arrange for temporary public accommodations and transportation for a small number of Asylum Refugees in nearby counties. As part of the Humanitarian Program, the City and RRT entered into agreements with Plaintiff Hotels to temporarily accommodate Asylum Refugees.

**B.    Defendant Counties, Working Hand in Hand with Town Municipalities, Take Retaliatory Actions in Violation of the Constitutional and Federal Rights of Plaintiffs**

122.    In response, each of the Defendant Counties passed discriminatory Executive Orders which, *inter alia*, prohibits the public accommodation and transportation of Asylum Refugees within Defendant Counties' territorial limits, constitutionally impairing Plaintiffs' agreements, and violating Plaintiffs rights under federal law and the U.S. Constitution.

123.    Each of the Executive Orders specifically targets and prohibits the lawful performance of lawful agreements by hotels and service providers such as RRT engaged in providing transportation and temporary public accommodations to the Asylum Refugees.

27

124.    Further, many Defendants have selectively prosecuted and enforced, with discriminatory intent and impact, facially-neutral local laws, including zoning and building codes, against Plaintiffs, in a flagrant attempt to deny Plaintiffs their rights and obligations to rent their public accommodations to Asylum Refugees, free from discrimination based on race, color, national origin or alienage.

i.    *Rockland County and Orangetown*

125.    On May 6, 2023, just one day after Mayor Adams' announcement of the Humanitarian Program to accommodate Asylum Refugees, Rockland County issued a broad Executive Order prohibiting anyone – whether municipalities, individuals or entities – from contracting to provide transportation or lodging to Asylum Refugees without an express license from the County Executive and deputizing the Sheriff to make stops of persons – such as Plaintiffs – suspected of transporting or sheltering Asylum Refugees. *See* **Exhibit A-1**. For violations of the Executive Order, it authorizes the Sheriff to issue tickets mandating court appearances and provides for civil penalties.

126.    The Rockland County Order, by its plain terms, prohibits – exclusively – Plaintiffs' agreements for the transportation and provision of temporary lodging to "migrants or asylum seekers."

127.    The Rockland County Order does not prohibit any other agreement, nor any other class of persons or hotels engaged in such lawful contracting for lawful services.

128.    The Rockland County Order further proscribes penalties of $2,000 per Asylum Refugee sheltered by any hotel or public accommodation in the County.

129. On the same day that Rockland County issued its order, County Executive Ed Day took to the media to let the public know exactly why he was taking steps to preclude Asylum Refugees from entering Rockland County.

130. He told a radio host, referring to Asylum Refugees, that "[w]ithin that cadre of people who are coming here, who are not vetted, we have child rapists, we have criminals, we have people who are MS-13." *See 'Rockland County exec warns cops are 'deployed' if NYC tries to bus migrants there,'* New York Post, (May 7, 2023) available at: https://nypost.com/2023/05/07/rockland-county-exec-warns-cops-are-deployed-if-nyc-tries-to-bus-migrants-there/. Addressing Mayor Adams' Humanitarian Program, he said "here is my response … Mr. Adams, you can try to run us over [and] I will reach up and grab you by the throat for the people of Rockland County…You are not getting away with this." *Id.*

131. In a Fox News interview on May 8, 2023, County Executive Day questioned "Are these people vetted?" and stated "What's going to happen if [Asylum Refugees] come here, they're going to stay here. They're not going to go back anywhere. They're going to keep growing and growing." *See May 8, 2023 Fox News Interview with Ed Day,* available at: https://www.foxnews.com/video/6327056123112.

132. On May 9, 2023, as part of its efforts to apply the unconstitutional Rockland Order and enforce the policy set forth therein, Defendant Orangetown brought legal action against Plaintiff Armoni in Rockland County Supreme Court in support of an *ex parte* TRO. Plaintiff Armoni is one of the hotels which agreed to provide temporary public accommodations to a small number of the Asylum Refugees.

133. In a Fox News interview the day before initiating suit, Orangetown Town Supervisor Teresa Kenny, explained why Orangetown was prepared to go to court: "Our concern

29

is public safety. We don't know if there have been background checks on these people. Anyone who's been around a long time knows we had a very sad incident where someone was killed by an immigrant. I'm not saying I think all immigrants are criminals … it just takes one."

134.    As evidenced by Defendant Orangetown's Complaint, annexed as **Exhibit D**, Defendant Orangetown seeks to enforce the Rockland County Order by expressly relying upon and citing to it at paragraph 29 thereof, without limitation.

135.    Defendant Orangetown's Complaint and corresponding alleged zoning violations selectively prosecute and enforce facially-neutral laws with discriminatory intent and purpose only against Plaintiffs Hotels – *i.e.*, only against those hotels that have agreed to make public accommodations available to the Asylum Refugees, without regard to race, color, national origin, or alienage.

136.    Similarly, as part of its efforts to apply the unconstitutional Rockland County Order and enforce the discriminatory policy set forth therein, Rockland County commenced its own action on May 10, 2023 against Plaintiff Armoni, among others defendants, and obtained a TRO prohibiting Plaintiffs from transporting for the purpose of renting, and prohibiting Plaintiffs from renting, any and all rooms in all hotels, motels and all short term rentals located in Rockland County to Asylum Refugees. The TRO orders, in pertinent part, that:

> Palisades Estates EOM LLC, through their agents, servants, representatives, and employees are temporarily restrained and enjoined from transporting approximately 340 homeless adult individuals currently residing in a temporary shelter in New York City to the Armoni Inn & Suites Hotel situated in the County of Rockland.

*See* **Exhibit B**.

137.    Defendant Rockland County's Verified Petition and Complaint, dated May 9, 2023, at paragraph 13, expressly relies on the Rockland Executive Order to prohibit providing

temporary lodging to Asylum Refugees. *See* Rockland County Petition and Complaint at ¶ 13, annexed hereto as **Exhibit F.**

138. Unsatisfied with two separate TROs prohibiting Armoni from renting rooms to the Asylum Refugees, Rockland County went a step further, seeking to make an example out of Armoni, and sending a message to other hotels in Rockland County.

139. Rockland County denied Armoni a necessary temporary residence permit, and subsequently forced Armoni to close indefinitely, displacing ordinary hotel guests then staying at the Armoni (the "Closure Order"). Rockland County gave one reason for denying Armoni the right to do business: Armoni's agreement to provide temporary public accommodations to the Asylum Refugees – as required under Title II, 1981, 1983 and the Fourteenth Amendment. Rockland County then forced Armoni to shut down indefinitely and, for the days that followed, monitored the property by on-site county law enforcement twenty-four hours per day. As a result, Armoni and Aims Orangeburg were forced to cancel all future reservations and evict all existing guests (none of whom were Asylum Refugees). Moreover, Plaintiff Armoni has been further denied its rights under the Fifth Amendment Takings Clause, as incorporated against the States by the Fourteenth Amendment.

140. On June 9, 2023, notwithstanding the facial and as-applied unconstitutionality of the Rockland County Order, and Orangetown's discriminatory enforcement thereof through its zoning laws, a Justice of the Supreme Court of Rockland County granted Orangetown a preliminary injunction, enjoining Armoni from making its public accommodations available to the Asylum Refugees, as required by federal law and the Constitution.

141. As a result of the unlawful and unconstitutional enforcement of the Rockland County Order, and Orangetown's selective discriminatory enforcement of its facially-neutral local

laws, Plaintiffs RRT and Armoni are prohibited from contracting or otherwise making public accommodations to Asylum Refugees in Rockland County, including Orangetown therein, and from performing their lawful obligations.

ii. _Orange County and Newburgh_

142.    Much like Rockland County, Orange County issued an Executive Order on May 8, 2023, expressly prohibiting Plaintiffs from transporting and renting to Asylum Refugees any and all rooms in all hotels, motels and all short term rentals located in its territorial limits.

143.    As with the Rockland County Order, the Orange County Order similarly facially violates Plaintiffs' rights under the U.S. Constitution by prohibiting "hotels, motels and/or any facilities allowing short-term rentals" from "accept[ing] … migrants and/or asylum seekers for housing within Orange County." _See_ **Exhibit A-2**.

144.    The Orange County Order does not target any class of person other than parties such as Plaintiff Hotels who have lawfully agreed to provide temporary public accommodations and transportation services to Asylum Refugees.

145.    The Orange County Executive Order on its face directs that it will be enforced by municipalities, such as Newburgh, "**through enforcement of local zoning codes, [by which] said migrants and/or asylum seekers will face refusal, or eviction." [emphasis added.]**

146.    One day after issuing the Orange County Order, County Executive Steve Neuhaus explained his rationale behind the order in a series of media appearances. He explained that the Orange County Order "tells the hotels here do not accept any of these asylum seekers and that's the way it's going to be." _See 'Neuhaus says migrants could start arriving Wednesday in Orange County,'_ Spectrum News 1 (May 9, 2023), available at:

https://spectrumlocalnews.com/nys/hudson-valley/news/2023/05/09/neuhaus-says-buses-of-migrants-could-start-arriving-wednesday.

147.    In another interview, County Executive Neuhaus stated "Right now we have no idea who these people are. We have no idea what their backgrounds are." He further questioned "Are they criminals?" *See 'Mixed reactions in Orange County following news of asylum seekers' upcoming arrival*," ABC 7 (May 9, 2023), available at: https://abc7ny.com/orange-county-asylum-seekers-ny-new-york/13228007/. He further lamented "What are these individuals going to do?" and declared "I am opposed to these asylum seekers being sent to our communities." *See 'Orange County declares state of emergency in response to NYC plan to bus asylum seekers to Newburgh,'* News 12 Hudson Valley (May 8, 2023), available at: https://hudsonvalley.news12.com/orange-county-declares-state-of-emergency-in-response-to-nyc-plan-to-bus-asylum-seekers-to-newburgh.

148.    On May 12, 2023, Orange County, and Newburgh therein, collectively commenced three separate actions each relying upon the constitutionally infirm Orange County Order (1) to prohibit Plaintiffs from transporting for the purpose of renting, and renting, any and all rooms in all hotels, motels and all short term rentals located in Orange County to Asylum Refugees; and (2) seeking a mandatory injunction to forcibly evict approximately 60 Asylum Refugees from Plaintiffs Crossroads Hotel and Ramada and forcibly transport these Asylum Refugees back to New York City. Copies of the Orange County Petition and Complaint and the Orange County Complaint are annexed hereto as **Exhibit G**; *see also* **Exhibit E**.

149.    As with Orangetown, Newburgh selectively prosecutes and enforces both the Orange County EO, and its facially-neutral zoning laws, in a discriminatory manner and with discriminatory intent and impact.

33

150.     The day before Newburgh commenced its lawsuit, Newburgh Town Supervisor Gil Piaquadio shared that he "informed Mayor Adams about [his] concerns with regard to the absence of background checks on these 60 men." *See 'Asylum Seekers Arrive in Town of Newburgh One Day After State & NYC Officials Promised to Delay Plan,'* The Newburgh News (May 11, 2023), available at: https://newburghnews.press/2023/05/11/asylum-seekers-arrive-in-town-of-newburgh-one-day-after-state-nyc-officials-promised-to-delay-plan/. He continued that he "told Mayor Adams that the safety of the Town of Newburgh residents is most important." *Id.*

151.     In the interim, on May 16, 2023, a Justice of the New York Supreme Court in Orange County granted Orange County's and Newburgh's respective requests for TROs, ordering Plaintiffs Crossroads, Ramada, and RRT to cease from providing public accommodations to any additional Asylum Refugees or "altering the use" of those hotels which, according to Defendants, would include using the hotels in the manner they are currently being used. *See* **Exhibit B**.

152.     On June 21, 2023, notwithstanding the facial and as-applied constitutional and federal statutory infirmities of the Orange County Order, and Orange County's discriminatory selective enforcement of facially-neutral zoning laws in furtherance of such discrimination, the Supreme Court of Orange County granted Orange County a preliminary injunction enjoining Crossroads, Ramada, Aims Newburgh, and Aims Orangeburg from making public accommodations available to Asylum Refugees, in violation of the Constitution and federal civil rights statutes. *See* **Exhibit C**.

153.     Due to the unlawful and unconstitutional Orange County Order and Newburgh's selective discriminatory and pretextual enforcement of its local laws intended to effectuate it, Plaintiffs RRT, Crossroads, Ramada, Aims Newburgh, and Aims Orangeburgh are now effectively prohibited from making public accommodations available to the Asylum Refugees in Orange

County, including Newburgh therein, and from performing their lawful obligations in connection therewith.

### iii. _Dutchess County and Poughkeepsie_

154.    Following the roadmap established by Rockland County and Orange County – by and through all Defendant Counties and Townships conspiring and communicating with each other to further the unconstitutional and unlawful violations set forth herein – on May 18, 2023, Dutchess County issued an Executive Order, expressly in response to the "national immigration crisis in the United States[, which] has resulted in thousands of migrants and/or asylum seekers entering the United States." _See_ **Exhibit A-3**.

155.    The Dutchess County Order declares that "public safety is imperiled" by the prospect of Asylum Refugees being offered temporary public accommodations in Dutchess County and – in a clear and facial violation of Plaintiffs' rights – instructs that "hotels, motels, or other short-term rentals" are not permitted to act as "an emergency shelter, or a homeless shelter." _Id._

156.    The Dutchess County Order further directs how it will be enforced: **"through the enforcement of local sanitary code, zoning code, and building code, migrants and/or asylum seekers may face refusal, removal, or eviction from hotels, motels, or short term rentals…".** _Id._

157.    The Executive Order explicitly references Plaintiff South Road as a hotel in negotiation with New York City to accept Asylum Refugees. It does not impede any agreements other than those entered into by the Plaintiff Hotels who have lawfully agreed to provide temporary public accommodations and transportation services to Asylum Refugees.

158.    Prior to issuing the Dutchess County Order, Dutchess County Executive William F. X. O'Neil wrote to hotels thanking all who "refused" requests to participate in New York City's Humanitarian Program and asking them "to consider the implications of your decision for the broader community" when deciding whether to accept Asylum Refugees. *See* Letter from County Executive William F. X. O'Neil to Reclaimed Motel, Attn: Kendra Sinclair (May 11, 2023), available at: https://www.thedailycatch.org/wp-content/uploads/2023/05/Reclaimed-Motel-2.pdf.

159.    The day after he issued the Dutchess County Order, County Executive O'Neil released a statement in which he shared that he executed the state of emergency to "preserve our rights and safeguard the well-being of our residents and our community by enforcing various established codes and regulations," mentioning Plaintiff Route 9 as one of the hotels looking to accommodate Asylum Refugees. *See 'Dutchess Declares Emergency Over Possible Arrival Of Asylum Seekers,'* Mid-Hudson Valley, NY Patch (May 19, 2023), available at: https://patch.com/new-york/midhudsonvalley/dutchess-declares-emergency-over-possible-arrival-asylum-seekers.

160.    Will Truitt, Majority Leader of the of the Dutchess County Legislature, reinforced that position, stating in reference to the Dutchess County Order that he "want[s] to make it clear that I am adamantly opposed to our local hotels housing migrants, and that Dutchess County does not have the resources to do this. We have already delayed one attempted plan by NYC to bus migrants here and are being vigilant to both delay and cancel any future plans." *See 'Dutchess County Takes Extreme Measure Against Migrant Busses,'* WRRV (May 24, 2023), available at: https://wrrv.com/dutchess-county-migrant-busses/.

161.    One day after Dutchess County issued the Dutchess County Order, on May 19, 2023, Defendants Dutchess County and Poughkeepsie – a town therein – initiated separate civil

actions in the New York Supreme Court in Dutchess County, seeking similar injunctive relief as sought by Rockland County, Orangetown, Orange County, and Newburgh, prohibiting the provision of temporary public accommodations to Asylum Refugees in Dutchess County, and in Poughkeepsie. A copy of the Dutchess County Petition and Complaint and the Poughkeepsie Complaint are annexed hereto as **Exhibit H** and **Exhibit I**, respectively.

162.    Dutchess County and Poughkeepsie collectively sued Plaintiffs South Road, Hudson Conference, Route 9, Sai Ram, and Patel, all of whom have obligations – and federal obligations under Title II, 1981, 1983 and the Fourteenth Amendment - to provide public accommodations to Asylum Refugees in Dutchess County.

163.    On May 23, 2023, a Justice of the New York Supreme Court in Dutchess County granted a TRO prohibiting the "transport[ation of] any so-called migrants and/or asylum seekers and/or asylum refugees to the County of Dutchess …".

164.     Due to the unconstitutional Dutchess County Order and Poughkeepsie's selective and discriminatory prosecution and enforcement of its local laws to effectuate it, Plaintiffs RRT, South Road, Hudson Conference, Route 9, Sai Ram, and Patel are now effectively prohibited from providing public accommodations and transportation to Asylum Refugees in Dutchess County, including Poughkeepsie therein, and from performing their lawful preexisting obligations.

   *iv.  Rensselaer County*

165.    On May 9, 2023, Rensselaer County declared a State of Emergency stating that "the County of Rensselaer does not have the capacity or resources to receive and sustain an extraordinary increase in the number of illegal aliens,"[2] and asserting that Asylum Refugees taking harbor in Rensselaer County would "imperil[] the public safety." *See* **Exhibit A-4**.

---

[2] There is no evidence that any of the Asylum Refugees are in the United States unlawfully.

166.    The same day, Rensselaer County issued an Executive Order pursuant to its State of Emergency which prohibits any "municipality," such as New York City, from "mak[ing] contracts with persons, businesses or entities doing business within the County to transport migrants or asylum seekers to location in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive," and makes clear that no entity may enter such contracts on any municipality's behalf. *Id.* This State Action impairs Plaintiff RRT's rights to freely contract with participating hotels who wish to provide public accommodations and transportation to the Asylum Refugees, consistent with Title II., 1981, 1983, and the Fourteenth Amendment equal protection and due process clauses.

167.    Facially violating Plaintiffs' constitutional and federal statutory rights, the Rensselaer County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Rensselaer County is permitted to contract or otherwise engage in business with any other municipality other than the County of Rensselaer … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

168.    The Rensselaer County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

169.    The licensing scheme created by the Rensselaer County Order is arbitrary, capricious and subject to the "satisfaction" of the Public Health Director of the Rensselaer County Department of Health (the "Rensselaer Health Director"). *Id.*

170.    The Rensselaer County Order deputizes the Sheriff, the Rensselaer Health Director, and the Rensselaer Health Director's designees to "issue appearance tickets for any violation of

38

this Emergency Order" and authorizes civil penalties of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues." *Id.*

171.   Evidencing a coordinated conspiracy to violate Plaintiffs' fundamental constitutional and federal statutory civil rights, Rensselaer County Executive Steve McLaughlin referenced the Rockland County Order and the Orange County Order when announcing the Rensselaer County Order, and referred to Mayor Adams' Humanitarian Program as "amount[ing] to human trafficking from New York City into other areas upstate." *See 'Rensselaer County Exec. Issues State of Emergency following NYC migrant reports,'* WRGB Albany (May 9, 2023), available at:  https://cbs6albany.com/news/local/rensselaer-county-executive-steve-mclaughlin-issues-state-of-emergency-following-nyc-migrant-reports-rockland-and-orange-title-42.

172.   Underscoring the discriminatory animus of the Rensselaer County Order, the same day he issued the Order, County Executive McLaughlin explained its impetus in a Facebook post, sharing that other County Executives had informed him that "Mayor Adams is not backing down from his plan and intends to follow through on contracts to move and house these migrants," – and despite that all costs of such public accommodation and related services are being borne by NYC – he asserted "[w]e do not have the structure or the resources to take care of these people being forced out of New York City." *See 'Rensselaer County issued state of emergency over relocation of migrants,'* Spectrum News 1 (May 9, 2023), available at: https://spectrumlocalnews.com/nys/capital-region/news/2023/05/09/rensselaer-county-issues-state-of-emergency-over-relocation-of-migrants-.

173.   Plaintiff RRT has contracted with New York City to identify hotels Statewide throughout New York which are willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary

public accommodations, and provide Asylum Refugees with transportation to such hotels. Pursuant to its contractual obligations, Plaintiff RRT has entered into agreements with hotels located in Rensselaer County, to provide public accommodations and transportation thereto under the terms of its existing contract with NYC.

174.    The Rensselaer County Order violates Plaintiff RRT's constitutional and federal rights under Title II, 1981, 1983, and the Constitution's contract clause and Fifth and Fourteenth Amendments.

v.    *Herkimer County*

175.    On May 12, 2023, Herkimer County declared a State of Emergency, stating that "Herkimer County is not capable of receiving or sustaining any number of migrants and/or asylum seekers." *See* **Exhibit A-5**.

176.    The same day, Herkimer County issued an Executive Order pursuant thereto, which prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Herkimer] County for any length of time without the express written permission of the Chairman of the Herkimer County Legislature," and makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

177.    Facially violating Plaintiffs' constitutional and federal civil rights, the Herkimer County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Herkimer County is permitted to contract or otherwise engage in business with any other municipality other than the County of Herkimer … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

178.    The Herkimer County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary public accommodations and transportation services for Asylum Refugees.

179.    Mimicking the County Executive Orders passed by several other Defendant Counties, the Herkimer County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order" and authorizes civil penalties of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues." *Id.*

180.    The Herkimer County Order further imposes criminal sanctions for any violator, deeming "any person who knowingly violates the provisions of this order … guilty of a Class B Misdemeanor." *Id.*

181.    Plaintiff RRT has contracted with New York City to identify hotels throughout New York state willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has entered into agreements with hotels located in Herkimer County to provide public accommodations and transportation thereto under the terms of its existing contract with New York City.

182.    The Herkimer County Order violates Plaintiff RRT's constitutional and federal rights under Title II, Section 1981, Section 1983, and the Constitution's Contract Clause and Fifth and Fourteenth Amendments.

vi. _Oneida County_

183.    On May 11, 2023, Oneida County declared a State of Emergency and issued an Executive Order pursuant thereto, in which it expressly identified the "national immigration crisis" and acknowledged that New York City implemented its Humanitarian Program after New York City's "homeless, social, health, and emergency services" were strained. _See_ **Exhibit A-6**.

184.    Nonetheless, the Oneida County Order states that "unrestricted, unlawful migration poses a grave risk to the social, health, and emergency services resources of the County, particularly during this period of economic growth when the County's inventory of housing and emergency housing is at historic lows." _Id._ The Oneida County Order further asserts that "the County of Oneida is responsible for securing the health and safety of its residents," and expressed concern that the accommodation of Asylum Seekers in Oneida County "will create a social, health, and emergency services crisis … threatening the health and public safety of County residents and any relocated Migrants." _Id._

185.    The Oneida County Order goes on to prohibit any "person, business or entity doing business within the County of Oneida" from "agree[ing] or contract[ing] with any municipality to transport to or within the County of Oneida any Migrant without the prior written permission of the County Executive or his designee …" _Id._

186.    Facially violating Plaintiffs' constitutional rights, the Oneida County Order further states that "[n]o hotel, motel, shelter, campground, or owner of a multiple dwelling in the County of Oneida shall agree or contract with any municipality to sell, lease, rent, or otherwise provide hotel rooms, housing, campgrounds, motel rooms, or short-term rentals to any Migrant without the prior written permission of the County Executive or his designee …" _Id._

187.    The Oneida County Order targets only parties such as Plaintiff RRT and Plaintiff hotels who have entered, or intend to enter, into lawful agreements to provide temporary public accommodations and transportation for Asylum Refugees

188.    The Oneida County Order punishes violation thereof with criminal sanctions, as it makes violators guilty of a class B misdemeanor, and deputizes the Oneida County Sheriff "to issue appearance tickets for any such knowing violation …" *Id.* Violation of the Oneida County Order is further punishable by a penalty of $2,000 per day, per Asylum Refugee "transported to or within the County or housed within the County …" *Id.*

189.    In discussing his impending issuance of the Oneida County Order, Oneida County Executive Anthony J. Picente Jr. made his intent behind the Order clear: "An emergency order would prevent any of the hotels or shelters from accepting any of the busloads or any migrants that were being sent up here from New York City or from Albany." *See 'As Title 42 expires, Oneida County emergency order prevents hotels or shelters from accepting migrants,'* WRVO (May 10, 2023), available at: https://www.wrvo.org/politics-and-government/2023-05-10/as-title-42-expires-oneida-county-emergency-order-prevents-hotels-or-shelters-from-accepting-migrants.

190.    Further demonstrating the discriminatory intent at the heart of the Oneida County Order, Picente acknowledged that Oneida County uses hotels to house families who reside in the county and are in emergency situations, but drew a contrived distinction between such preexisting residents and Asylum Refugees: "When we do the emergency services thing it's temporary that these people are eligible for … In this case [Asylum Refugees] are not so what we do with them? How do we feed them? How do you take care of them? How do you know what their health conditions are? … There are a lot of issues here." *Id.*

191.    Plaintiff RRT has contracted with New York City to identify hotels statewide willing and able to provide temporary public accommodations for Asylum Refugees – at the cost to New York City – enter into agreements with such hotels for the provision of such temporary public accommodations, and provide Asylum Refugees with transportation to such hotels. Plaintiff RRT has entered into agreements with hotels located in Oneida County, and to provide transportation thereto under the terms of its existing contract.

192.    As a result of the Oneida County Order, and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal rights, Plaintiff RRT is now prohibited from entering into its intended agreements to provide public accommodations for Asylum Refugees in Oneida County, and is further impeded in performing its lawful preexisting contractual obligations.

vii. _Broome County_

193.    On May 11, 2023, Broome County declared a State of Emergency in which it declared that "Broome County is not capable of receiving and sustaining any number of migrants and/or asylum seekers." _See_ **Exhibit A-7**.

194.    The same day, Broome County issued an Executive Order pursuant thereto, which unsurprisingly tracks several other of the County Executive Orders issued by Defendant Counties, by prohibiting any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Broome] County for any length of time without the express written permission of the County Executive," and makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection" _Id._

195.    Facially violating Plaintiffs' constitutional rights, the Broome County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling, or shelter in Broome County is permitted to contract or otherwise engage in business with any other municipality other than the County of Broome … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

196.    The Broome County Order targets only parties such as Plaintiff RRT and Plaintiff hotels which have lawful agreements to provide temporary public accommodations and transportation services for Asylum Refugees.

197.    The licensing scheme created by the Broome County Order is arbitrary, subject to the "satisfaction" of the Broome County Health Department Director. *Id.*

198.    In furtherance of Defendants' conspiracy to deny constitutional and federal statutory civil rights to Plaintiffs and their clients (*i.e.*, the Asylum Refugees), Broom County and its officials mimic several other County Executive Orders issued by Defendant Counties, as evidenced by the Broome County Order deputizing the Sheriff to "issue appearance tickets for any violation of this Emergency Order" and authorizing civil penalties of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues." *Id.*

199.    The Broome County Order further imposes criminal sanctions for any violator, deeming "any person who knowingly violates the provisions of this order … guilty of a Class B Misdemeanor." *Id.*

200.    In discussing his motivations for issuing the Executive Order, Broome County Executive Jason Garnar acknowledged that hotels in Broome County are used to house residents of the County who would otherwise be homeless but made clear that he aspired to preclude Asylum

Seekers from benefitting from the same accommodations. "The limited resources we have are for Broome County residents first and foremost; we do not have the capacity to take on large groups of people should they arrive in our community." See *"We do not have the capacity": Broome County issues state of emergency in effort to keep NYC from sending migrants*, Spectrum News 1 (May 11, 2023), available at: https://spectrumlocalnews.com/ nys/binghamton/news/2023/05/11/broome-co–issues-order-to-keep-nyc-from-busing- migrants#:~:text=Broome%20County%20Executive%20Jason%20Garnar,state%20to%20take% 20in%20migrants.

201.    Of course, the issue is not one of resources to be spent by Broome County, or any Defendant County, because costs, such as the temporary public accommodations and transportation of Asylum Refugees, are borne by New York City. Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary public accommodations, and provide Asylum Refugees with transportation thereto. Plaintiff RRT has entered into agreements with hotels located in Broome County, and to provide transportation thereto under the terms of its existing agreements.

202.    Due to the Broome County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional rights, Plaintiff RRT is now prohibited from entering and performing its agreements to provide temporary public accommodations for Asylum Refugees in Broome County, and is further impeded in performing its lawful preexisting contractual obligations.

viii. _Genesee County_

203.    On May 17, 2023, Genesee County declared a State of Emergency "arising from New York City's actions to rapidly divert the number of migrants to other Counties in New York State to unsustainable levels." *See* **Exhibit A-8**. The declaration asserts that "Genesee County does not have the capability to receive or sustain any number of migrants and/or asylum seekers. This situation is a threat to public safety." *Id.*

204.    Genesee County issued a series of Executive Orders pursuant to its State of Emergency, extending and modifying its original breadth. Most recently, on June 16, 2023, Genesee County issued an Executive Order which facially violates Plaintiffs' constitutional rights by prohibiting any "hotel, motel, shelter, or other multiple-dwelling unit in Genesee County, or any person or corporation acting on behalf of such hotel, motel, shelter, or other multiple-dwelling unit" from "enter[ing] into a contract with any municipality, corporation, partnership individual, or any other entity for the purpose of providing emergency housing for homeless individuals in Genesee County" without County approval. *Id.*

205.    The Genesee County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

206.    The Genesee County Order deputizes the Sheriff, the County Manager, and the County Manager's designees to issue appearance tickets for any violation of the Order and imposes civil fines of up to "$2,000 per individual housed … for each day or part thereof during which such violation continues." *Id.*

207.    One day after declaring the Genesee County Order, on May 18, 2023, Genesee County Manager Matt Landers took to the media to explain the purpose underlying the Order:

"One of the major reasons for the executive order is because asylum seekers could show up at our door without our knowledge … We don't know their background and they're going to be in our community embedded with us in a situation where we can't house our own homeless." *See 'Local counties attempting to stop migrants from being bused to their communities,'* WKBW (May 18, 2023), available at: https://www.wkbw.com/news/local-news/local-counties-attempt-to-stop-migrants-from-being-bused-to-their-communities.

208.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary public accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has entered into agreements with hotels located in Genesee County, and to provide transportation thereto under the terms of its existing contract.

209.    Due to the Genesee County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering into and/or performing its agreements to provide temporary public accommodations for Asylum Refugees in Genesee County, and is further impeded in performing its lawful preexisting contractual obligations.

ix.   *Orleans County*

210.    On May 17, 2023, Orleans County declared a State of Emergency, stating that "Orleans County does not have the capability to receive or sustain any number of migrants and/or asylum seekers," and referring to the prospect of the accommodation of Asylum Refugees within Orleans County as "a threat to public safety." *See* **Exhibit A-9**.

211.    The same day, Orleans County issued an Executive Order pursuant thereto, which prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Orleans] to transport migrants or asylum seekers to locations in [Orleans] County, or to house persons at locations in [Orleans] County for any length of time without the express written permission of the Chairman of the Orleans County Legislature," and makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

212.    Facially violating Plaintiffs' constitutional rights and tracking several other County Executive Orders issued by the Defendant Counties, the Orleans County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Orleans County is permitted to contract or otherwise engage in business with any other municipality other than the County of Orleans … for the purpose of providing housing or accommodations for migrants or asylum seekers without written approval granted by the County." *Id.*

213.    The Orleans County Order targets only parties such as Plaintiff RRT and hotels who have entered, or have the right to enter, into lawful agreements to provide temporary public accommodations and transportation services for Asylum Refugees.

214.    The Orleans County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order" and authorizes civil penalties of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues." *Id.*

215.    The Orleans County Order further imposes criminal sanctions for any violator, deeming "any person who knowingly violates the provisions of this order … guilty of a Class B Misdemeanor." *Id.*

216.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation thereto. Plaintiff RRT has entered into agreements with hotels located in Orleans County, and to provide transportation thereto under the terms of its existing contract.

217.    Due to the Orleans County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering into agreements to provide temporary public accommodations for Asylum Refugees in Orleans County, and is further impeded in performing its lawful preexisting contractual obligations.

x.   _Saratoga County_

218.    On May 19, 2023, Saratoga County declared a State of Emergency which explicitly regards "the national immigration crisis at the border between the United States and Mexico whereby an overwhelming number of illegal immigrants, migrants and asylum seekers are crossing over the open border of the United States" _See_ **Exhibit A-10**.

219.    The Saratoga County Declaration of a State of Emergency further states that Saratoga County "would be especially sensitive to further change in population," "does not have the capacity or resources to receive and sustain a significant increase in the number of illegal immigrants, migrants and/or asylum seekers," "anticipates potential civil disobedience and protesting on this issue," and accordingly finds "reasonable apprehension of the immediate danger thereof that public safety and public health is imperiled thereby, not only for the illegal immigrants, migrants and/or asylum seekers, but also to the other affected residents of Saratoga County…" _Id._

220.    The same day, Saratoga County issued an Executive Order pursuant to its State of Emergency which prohibits any "person, business or entity doing business within the County of Saratoga" from "agree[ing] or contract[ing] with any municipality to transport to or within the County of Saratoga any Migrant without the prior written permission of the Chief Executive or his designee…" *Id.*

221.    Facially violating Plaintiffs' constitutional rights, the Saratoga County Order further states that "[n]o hotel, motel, shelter, campground, short-term rental or owner of a multiple dwelling in the County of Saratoga shall agree or contract with any municipality to sell, lease, rent or otherwise provide hotel rooms, housing, campgrounds, motel rooms or short-term rentals to any Migrant without prior written permission of the Chief Executive or his designee…" *Id.*

222.    The Saratoga County Order targets only parties such as Plaintiff RRT and hotels who have entered, or intend to enter, into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

223.    The Saratoga County Order deputizes the Sheriff to "issue appearance tickets for any such knowing violation of this Local Emergency Order" and authorizes criminal sanctions for violation, deeming it a Class B misdemeanor. *Id.*

224.    Tellingly, after issuing the Saratoga County Order, Saratoga County announced that certain groups of migrants would be exempt from the order, such as migrants working in backstretch labor at Saratoga Race Course, whose representatives shared that Saratoga Board of Supervisors Chairman Theodore Kusnierz Jr. has arbitrary "discretion as to how it is enforced." *See 'Saratoga County: Migrant order won't be enforced on backstretch workers,'* The Daily Gazette (June 1, 2023), available at: https://dailygazette.com/2023/06/01/saratoga-county-migrant-order-wont-be-enforced-on-backstretch-workers/.

225.     Some local officials for towns located in Saratoga County observed the obvious hypocrisy inherent in Saratoga County's "discretionary" and pretextual approach to enforcement of the Saratoga County Order, with Spa City Public Safety Commissioner James Montagnino questioning such discretion as "arbitrary" and Spa City Mayor Ron Kim expressing concern for the impact on the city. *Id.*

226.     Demonstrating the discriminatory nature of the Saratoga County Order, Saratoga County Spokeswoman Christine Rush responded to criticism of Saratoga County's intended "discretionary" enforcement by clarifying that "[t]he order clearly states that it is a prohibition of contracts with municipalities to transport or house migrants that jeopardize the health, safety, or welfare of the county." *Id.*

227.     Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation thereto. Plaintiff RRT has entered into agreements with hotels located in Saratoga County, and to provide transportation thereto under the terms of its existing contract.

228.     Due to the Saratoga County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering and/or performing its agreements to provide temporary public accommodations for Asylum Refugees in Saratoga County, and is further impeded in performing its lawful preexisting contractual obligations.

xi. _Greene County_

229.    On May 17, 2023, Greene County declared a State of Emergency which states that "Greene County is incapable of receiving and sustaining the volume of migrants and/or asylum seekers that New York City intends to deliver," so Executive Orders "will be promulgated…to further protect life and property and to bring the emergency condition(s) under control." _See_ **Exhibit A-11**.

230.    On the same day, Greene County issued an Executive Order pursuant to its State of Emergency, predicated upon the declaration that "[i]f it were allowed for the City New York or other municipalities to simply flood the County with persons in need of services, as described in the related Declaration, this crisis would only worsen." _Id_.

231.    The Greene County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Greene] to transport migrants or asylum seekers to locations in [Greene] County, or to house persons at locations in [Greene] County for any length of time without the express written permission of the Chairman of the Greene County Legislature," and makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection" _Id._

232.    Facially violating Plaintiffs' constitutional rights and mimicking several other County Executive Orders passed by Defendant Counties, the Greene County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Greene County is permitted to contract or otherwise engage in business with any other municipality other than the County of Greene … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County."

233.    The Greene County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

234.    The licensing scheme created by the Greene County Order is arbitrary, subject to the "satisfaction" of the County Administrator of the County of Greene ("Greene County Administrator"). *Id.*

235.    The Greene County Order deputizes the Sheriff, the Greene County Administrator, and the Greene County Administrator's designees to "issue appearance tickets for any violation of this Emergency Order" and authorizes civil fines of up to "$2,000.00 per migrant/asylum seeker housed … for each day and part thereof during which such violation continues. *Id.*

236.    Tellingly, Greene County Legislature Chair Patrick Linger, the Greene County official responsible for issuing Executive Orders, expressed that even though Greene County often accommodates its own homeless residents in other New York counties, Greene County would not accept Asylum Refugees from New York City, as the accommodation of so much as 15 Asylum Seekers would render Greene County "overwhelmed." *See 'Greene County to fine any hotel that shelters migrants,'* Times Union (May 18, 2023), available at: https://www.timesunion.com/hudsonvalley/news/article/greene-sullivan-emergency-declaration-migrants-18105211.php.

237.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation thereto. Indeed, Plaintiff RRT is in negotiations with a potential hotel partner in Greene County and the parties are poised to enter

into an agreement by which the hotel will provide temporary public accommodations to Asylum Refugees, and Plaintiff RRT will provide transportation thereto, under the terms of its existing contract.

238.    Due to the Greene County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering into its agreement with its hotel partner to provide temporary public accommodations for Asylum Refugees in Greene County, and is further impeded in performing its lawful preexisting contractual obligations.

*xii. Sullivan County*

239.    On May 18, 2023, Sullivan County declared a State of Emergency which states that Sullivan County "is not capable of receiving clients from other local services districts, including New York City, and providing housing to those individuals," and declares that the arrival of Asylum Refugees "threatens the public health and the public safety." *See* **Exhibit A-12**.

240.    On the same day, Sullivan County issued an Executive Order pursuant to its State of Emergency, predicated upon the assertion that Sullivan County's "public safety is at risk due to the imminent danger of the number of social services clients from … another county entering Sullivan County." *Id.*

241.    The Sullivan County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities within the County of Sullivan to house social services clients from another county for any length of time without the express consent of the County Manager." *Id.*

242.    Facially violating Plaintiffs' constitutional and federal civil rights, and mimicking several other County Executive Orders passed by Defendant Counties, the Sullivan County Order

further states that "[n]o hotel, motel, or owner of a multiple dwelling in the County of Sullivan is permitted to contract with another municipality other than the County of Sullivan … for the purpose of providing housing to social services clients from another county without a license from the County of Sullivan." *Id.*

243.    The Sullivan County Order targets only parties such as Plaintiff RRT and hotels who have entered (or intend to enter) into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

244.    The Sullivan County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Order" and imposes a criminal penalty on violators, making violation of the Sullivan County Order a Class B misdemeanor. *Id.*

245.    Tellingly, when New York City informed Sullivan County that it intended to send Asylum Seekers to a hotel therein, Sullivan County Legislature Chair Robert Doherty said that "Sullivan County will do what it needs to do – including availing itself of all rights and remedies provided by law" to oppose the Humanitarian Program, notwithstanding his acknowledgement that Sullivan County often shelters its own otherwise homeless residents in local hotels, and complained that New York City is "unfairly and illegally making their problem our problem." *See 'NYC asylum seekers sent to Sullivan, could also be headed to Poughkeepsie,'* Times Herald-Record (May 19, 2023), available at: https://www.recordonline.com/story/news/local/2023/05/18/sullivan-county-legislative-chairman-opposes-arrival-of-nyc-migrants/70231766007/.

246.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation thereto. Indeed, some Asylum

Refugees have already arrived in Sullivan County, and Plaintiff RRT has agreements with hotels located in Sullivan County, and intends to provide transportation thereto under the terms of its existing contract.

247.    Due to the Sullivan County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Sullivan County, and is further impeded in performing its lawful preexisting contractual obligations.

*xiii.*    <u>*Onondaga County and Salina*</u>

248.    On May 18, 2023, Onondaga County issued an Executive Order expressly prohibiting Plaintiffs from transporting and renting to Asylum Refugees any and all rooms in all hotels, motels and all short term rentals located in its territorial limits. *See* **Exhibit A-13**.

249.    The Onondaga County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive." *Id.* The Onondaga County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … in violation of this subsection." *Id.*

250.    Facially violating Plaintiffs' rights under the U.S. Constitution and federal civil rights statutes, the Onondaga County Order prohibiting any "hotel, motel or owner of a multiple dwelling in Onondaga County" from "contact[ing] or otherwise engag[ing] in business with any

other municipality other than the County of Onondaga … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

251.    The Onondaga County Order does not target any class of person other than parties such as Plaintiff Hotels who have lawfully agreed to provide temporary lodging and transportation services to Asylum Refugees.

252.    Before issuing the Onondaga County Order, Onondaga County Executive Ryan McMahon took to the media to declare his position on the prospect of Onondaga County temporarily accommodating Asylum Refugees, for whom he dog-whistled his disdain: "Over the next 48 hours, the situation at the southern border is going to impact communities across this country in ways that it hasn't already. We're concerned about the idea of numerous single males coming to our community with no ability to work, housing these individuals, monitoring these individuals who we don't know who they are … This is a recipe for real problems." *See 'Asked about projected migrant influx to New York, Onondaga County Executive days 'We're not a sanctuary city,''* Local SYR (May 10, 2023), available at: https://www.localsyr.com/news/local-news/asked-about-projected-migrant-influx-to-new-york-onondaga-county-executive-says-were-not-a-sanctuary-city/.

253.    On another occasion, County Executive McMahon tweeted that the federal government needed to "do its job and secure the border," and that "[b]y no means at this point are we prepared to accept migrants from other governments." *See 'NYC to comply with ruling barring migrants from being housed in Onondaga County,'* The Daily Orange (May 24, 2023), available at: https://dailyorange.com/2023/05/syracuse-judge-rules-to-prevent-incoming-migrants-to-enter-onondaga-county/.

254.    County Executive McMahon's rhetoric on the temporary accommodation of Asylum Refugees is especially shocking when contextualized by the letter he co-authored to President Biden last year in which he stated that Onondaga County was "ready, willing and able to welcome and resettle Ukrainian refugees" and was prepared to act "as a partner to bring as many of our Ukrainian allies out of harm's way as possible, welcoming refugees into a diverse and caring community in America." *See 'Syracuse, Onondaga County 'ready, willing, and able' to host Ukrainian refugees,'* CNY Central (March 3, 2022), available at: https://cnycentral.com/news/local/syracuse-onondaga-county-ready-willing-and-able-to-host-ukrainian-refugees.

255.    Apparently, Onondaga County is fine with openly accepting white refugees from Ukraine, but openly discriminates against the Asylum Refugees which are largely, if not exclusively, comprised of discrete and insular racial and ethnic minorities. Thus, on May 22, 2023, Onondaga County commenced an action relying on the constitutionally infirm Onondaga County Order to prohibit the transportation of Asylum Refugees to hotels in Onondaga County, including, specifically, the hotel operated by Plaintiff CWP Syracuse. A copy of the Onondaga County Amended Petition and Complaint, filed May 24, 2023, is annexed hereto as **Exhibit J**.

256.    The following day, Salina commenced an additional action against Plaintiff CWP Syracuse with a Complaint that expressly relies on the Onondaga County Order, seeking to effectuate its unconstitutional and discriminatory policy objectives by and through discriminatory selective prosecution and enforcement of its local zoning codes. A copy of the Salina Complaint is annexed hereto as **Exhibit K**.

257.    Salina's Town Supervisor, Nick Paro, has made the rounds on national and local news outlets, using the public attention to share Salina's reasons for targeting Plaintiff CWP

Syracuse: "Our residents fear what will happen to their neighborhood if one, or two, or ten buses of illegal migrants roll into our town." *See 'Town of Salina Supervisor says NYC reached out about migrants coming to CNY,'* CNY Central (May 21, 2023), available at: https://cnycentral.com/news/local/town-of-salina-supervisor-says-nyc-reached-out-about-migrants-coming.

258.    Acknowledging that Salina is conspiring with Onondaga County in its unconstitutional and unlaw scheme action against CWP Syracuse, Town Supervisor Paro continued: "My office will use what resources we do have to fight back against this blatant disregard for Salina and its residents." *Id.* Doubling down in another interview, Town Supervisor Paro declared that Salina would "fight back against … becoming New York City's dumping ground for their illegal migrant problem." *See 'New York City alerts Town of Salina Supervisor first bus of migrants headed to Onondaga County,'* Local SYR (May 21, 2023), available at: https://www.localsyr.com/news/new-york-city-alerts-town-of-salina-supervisor-first-bus-of-migrants-headed-to-onondaga-county/.

259.    In the interim, on May 23, 2023, through state action by the New York Supreme Court in Onondaga County, Onondaga County and the Town of Salina sought and were granted their respective requests for TROs, ordering Plaintiffs CWP Syracuse and RRT to cease from transporting Asylum Refugees to hotels within Onondaga County, providing temporary lodging to any additional Asylum Refugees or "further modif[ying], alter[ing], or chang[ing] the use" of the Hotel, which, according to Defendants, would include using the hotel in the manner in which it is currently being used. *See* **Exhibit B**.

260.    As if two TROs were not enough, on June 14, 2023, Onondaga County and Salina, intent on making an example out of Plaintiff CWP Syracuse, sent law enforcement, Count and

Town officials to CWP Syracuse to conduct a warrantless entry and search of certain rooms in violation of the Hotel's constitutional rights. Shortly thereafter, a squad of individuals who identified themselves as Onondaga County social workers, Salina's Fire Marshal, and an Onondaga County attorney also entered the Hotel without a warrant, in further violation of Plaintiff's constitutional and federal rights. The individual who identified himself as an Onondaga County attorney informed CWP Syracuse staff that the officials were there to search for "illegal immigrants." The individual who claimed to be a County attorney was later identified to be Nick Kleist, the Chief Confidential Assistant to the County Attorney. Only once these officials confirmed that they did not have a warrant, and had no legal right to be at the Hotel, did they finally accede to the Hotel's demand for them to vacate the property. *See* **Exhibit L**.

261.    Defendants Onondaga and Salina's actions violate Plaintiffs' federal rights under Title II, Section 1981, and the Fourth, Fifth and Fourteenth Amendments to the US Constitution and further reflect the discriminatory animus underlying Onondaga County's and Salina's actions and orders.

262.    Due to the unlawful and unconstitutional Onondaga County Order and Salina's selective and discriminatory enforcement of its local laws to effectuate it, Plaintiffs RRT and CWP Syracuse are now prohibited from making temporary public accommodations available to the Asylum Refugees in Onondaga County, including Salina therein, and from performing their lawful preexisting obligations.

> xiv. *Chautauqua County*

263.    On May 18, 2023, Chautauqua County declared a State of Emergency explicitly in response thereto. *See* **Exhibit A-14**. The Chautauqua County State of Emergency declares that New York City's pro-immigrant "sentiments have now failed in the face of reality … [and] New

York City has threatened to alleviate the problem it has created for itself … by shipping its problems to other counties throughout New York State …" *Id.*

264.    The Chautauqua County Order issued by the County the same day bars the transportation and temporary accommodation of Asylum Refugees within Chautauqua County. *Id.*

265.    The Chautauqua County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities within [Chautauqua County] to transport migrants or asylum seekers to locations within [Chautauqua County], or to house persons at locations in [Chautauqua County] for any length of time without the express written permission of the County Executive." *Id.* The Chautauqua County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

266.    Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Chautauqua County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Chautauqua County is permitted to contract or otherwise engage in business with any other municipality other than the County of Chautauqua … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County."

267.    The Chautauqua County Order targets only parties such as Plaintiff RRT and hotels who have entered into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

268.    The licensing scheme created by the Chautauqua County Order is arbitrary, subject to the "satisfaction" of the Chautauqua County Executive. *Id.*

269.    The Chautauqua County Order deputizes the Sheriff, the Chautauqua County Executive, and the Chautauqua County Executive's designees to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

270.    Explaining his rationale for issuing the Chautauqua County Order, Chautauqua County Executive Paul M. Wendel stated: "Without knowing anything about these individuals, it's hard to just say, 'Yes, we'll take them because they can't work.'" *See 'WNY counties issue state of emergency over migrant crisis,'* WGRZ (May 18, 2023), available at: https://www.wgrz.com/article/news/local/migrant-crisis-niagara-county-issues-state-emergency/71-e4d411fc-c1a4-4043-93cb-5b40027682ef.

271.    Emblematic of the discriminatory nature of the Chautauqua County Order, George Borrello, the New York State Senator from the district which encompasses Chautauqua County and former Chautauqua County Executive, asserted that communities that never declared themselves as sanctuary communities shouldn't be forced to accept migrants. *See 'County Executive Wendel Declares State of Emergency Barring Housing of Additional Immigrants in County,'* WRFA (May 19, 2023), available at: https://www.wrfalp.com/county-executive-wendel-declares-state-of-emergency-barring-housing-of-additional-immigrants-in-county/.

272.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary

accommodation. Plaintiff RRT has agreements with hotels located in Chautauqua County, and intends to provide transportation thereto under the terms of its existing contract.

273.    Due to the Chautauqua County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering into and/or performing agreements to provide temporary public accommodations for Asylum Refugees in Chautauqua County, and is further impeded in performing its lawful preexisting contractual obligations.

*xv.  Fulton County*

274.    On May 19, 2023, Fulton County declared a State of Emergency "to protect the public safety and public health during the migrant relocation crisis in New York State." *See* **Exhibit A-15**.

275.    The Fulton County State of Emergency is explicit about its intent: to "restrict public and/or private entities from transporting migrants or asylum seekers to locations within the county, or to house such persons within the county without express written permit issued by the Chairman of the Board of Supervisors. This restriction includes hotels, motels, campgrounds, rental businesses or owners of any other dwelling." *Id.*

276.    The Fulton County Order issued pursuant to the State of Emergency declares that "the County of Fulton is responsible for securing health and safety of its residents" and "the mass arrival of these Migrants will create a social, health and emergency services crisis …" *Id.*

277.    In accord with this discriminatory and unlawful intent, the Fulton County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Fulton County] to transport migrants or asylum seekers to locations in [Fulton County], or to house persons at locations in [Fulton County] for any

length of time without the express written permission of the Chairman of the Fulton County Board of Supervisors." *Id.* The Fulton County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

278.     Facially violating Plaintiffs' constitutional and federal civil rights, and mimicking several other County Executive Orders passed by Defendant Counties, the Fulton County Order further states that "[n]o hotel, motel, campground, rental business or owner of any dwelling in Fulton County is permitted to contract or otherwise engage in business with any other municipality other than the County of Fulton for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

279.     The Fulton County Order targets only parties such as Plaintiff RRT and hotels who have lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

280.     The Fulton County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000.00 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

281.     Highlighting the true discriminatory intent underlying the issuance of the Fulton County Order, Fulton County Board of Supervisors Chairman Scott Horton said, regarding the prospect of Asylum Refugees being temporarily accommodated in Fulton County: "I think the writing is on the wall and we want to join our other upstate counties, and other counties throughout the state, that are concerned about this … [the Fulton County Order] is a way of protecting our people and sending a message that this is not the solution." *See 'Upstate counties take preemptive*

*measures as displaced migrants are moved upstate from New York City,'* The Daily Gazette (May 19, 2023), available at: https://dailygazette.com/2023/05/19/upstate-counties-take-preemptive-measures-as-displaced-migrants-are-moved-upstate-from-new-york-city/.

282.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Fulton County, and will provide transportation thereto under the terms of its existing contract.

283.    Due to the Fulton County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering and/or performing its agreements to provide temporary public accommodations for Asylum Refugees in Fulton County, and is further impeded in performing its lawful preexisting contractual obligations.

xvi. *Madison County*

284.    On May 19, 2023, Madison County declared a State of Emergency in response thereto, which specifically regards the "national immigration crisis at the border between the United States and Mexico," and claims that New York City has "decided to transfer its duties and responsibilities to the other counties adjacent to New York City ..." *See* **Exhibit A-16**.

285.    The Madison County State of Emergency declares that "there is reasonable apprehension of immediate danger of public emergency of potentially hundreds of persons being transported to Madison County and that Madison County will be responsible for the welfare and public safety of these persons and all others affected thereby …" *Id.*

286.     Notably, the Madison County State of Emergency instructs that it will be effectuated "through enforcement of local zoning codes," by which "migrants and/or asylum seekers may face refusal or eviction from the illegal hotels and short-term residential facilities …" *Id.*

287.     To carry out its unlawful premise, the Madison County Order prohibits "any municipality within Madison County [from] mak[ing] contracts with persons, businesses, or entities doing business within the territorial limits of Madison County to transport migrants or asylum seekers to locations in [Madison County], or to house persons at locations in [Madison County] for any length of time without the express written permission of the Chair of the Board of Supervisors or his designee." *Id.* The Madison County Order makes clear that "no person or entity may act on behalf of any municipality within Madison County or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

288.     Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Madison County Order further states that "[n]o hotel, motel, owner of a multiple dwelling, or shelter within Madison County is permitted to contract or otherwise engage in business with any other municipality … other than Madison County for the purpose of providing housing or accommodations for migrants or asylum seekers without a permit granted by the County."

289.     The Madison County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

290.    The licensing scheme created by the Madison County Order is arbitrary, subject to the "satisfaction" of the Director of Public Health of the Madison County Public Health Department. *Id.*

291.    The Madison County Order deputizes the Sheriff's Office to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/ asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

292.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Madison County, and will provide transportation thereto under the terms of its existing contract.

293.    Due to the Madison County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Madison County, and is further impeded in performing its lawful preexisting contractual obligations.

xvii.    <u>Niagara County</u>

294.    On May 18, 2023, Niagara County declared a State of Emergency expressly in response thereto. *See* **Exhibit A-17**.

295.     The Niagara County State of Emergency declares that "the mass arrival of these Migrants will create a social, health, and emergency services crisis … and will threaten the health and public safety of County residents and any relocated Migrants." *Id.*

296.     In an attempt to impede the transportation and temporary accommodation of Asylum Refugees in Niagara County – an unlawful and unconstitutional objective – the Niagara County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Niagara County] to transport migrants or asylum seekers to locations in [Niagara County], or to house persons at locations in [Niagara County] for any length of time without the express written permission of the Chairman of the Niagara County Legislature." *Id.* The Niagara County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

297.     Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Niagara County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Niagara County is permitted to contract or otherwise engage in business with any other municipality other than the County of Niagara … for the purpose of providing housing or accommodations for migrants or asylum seekers without written approval granted by the County."

298.     The Niagara County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

299.     The Niagara County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum

seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

300.    Confirming that Niagara County's intention behind the Niagara County Order is to close its borders to Asylum Refugees – a policy objective that violates the U.S. Constitution and state and federal law – Niagara County Legislature Majority Leader Randy Bradt shared that Niagara County "lack[s] the resources" to temporarily accommodate any Asylum Refugees, and referred to New York City's pro-immigrant disposition as an "ill-conceived policy [which] has produced the predictable results." *See 'Niagara County Issues State of Emergency Related to Immigrant Crisis,'* NiagaraCounty.com, available at: https://www.niagaracounty.com/news_detail_T8_R449.php. He characterized Mayor Adams' Humanitarian Program as "state and city officials … looking to upstate counties to bail them out." *Id.*

301.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Niagara County, and will provide transportation thereto under the terms of its existing contract.

302.    Due to the Niagara County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Niagara County, and is further impeded in performing its lawful preexisting contractual obligations.

*xviii.* __Oswego County__

303.     On May 15, 2023, Oswego County declared a State of Emergency in response thereto (which was subsequently renewed on June 14, 2023), explicitly referencing the "national immigration crisis at the border between the United States and Mexico," and the influx of "migrants and asylum seekers" to the United States and the State of New York, and concluded that the situation presents a "reasonable apprehension of immediate danger of public emergency" by which "Oswego County will be responsible for the welfare and public safety of these persons together with all others affected thereby in Oswego County …" *See* **Exhibit A-18**.

304.     Two days later, on May 17, 2023, Oswego County issued an Executive Order that bars local entities from engaging in the transport or housing of Asylum Refugees without a license and/or written permission from Oswego County. *Id.*

305.     In furtherance of its unlawful and discriminatory intent, the Oswego County Order bars the formation of contracts between municipalities and their representatives and "persons, businesses, or entities doing business within the territorial limits of the County of Oswego" providing for the transportation of individuals "en masse" – a term which the Oswego County Order does not define – from any other social services district to a location within Oswego County. *See id.*

306.     Facially violating Plaintiffs' constitutional rights, the Oswego County Order further states that "[o]wners of hotels, motels, and multi-unit housing in [Oswego County] are expressly prohibited from contracting or engaging with external municipalities for the purpose of providing housing or accommodations for migrants and asylum seekers without a license from the Oswego County Public Health Department." *Id.*

307.     The Oswego County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

308.     The licensing scheme created by the Oswego County Order is arbitrary, subject to the "satisfaction" of the Oswego County Public Health Director. *Id*

309.     The Oswego County Order further deputizes the County Sheriff's Office to "issue appearance tickets for any violations," authorizes civil fines of up to "$2,000 for each individual housed in violation of the order," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

310.     After issuing the Oswego County Order, Legislature Chairman Weatherup took to the media to proclaim that the Order was necessary to "safeguard our taxpayers from shouldering the economic and social burden of controversial policies from Washington, Albany and New York City." *See 'Oswego County issues emergency order that bans housing of migrants,'* Syracuse.com (May 17, 2023), available at: https://www.syracuse.com/politics/cny/2023/05/oswego-county-issues-emergency-order-that-bans-housing-of-migrants.html.

311.     Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Oswego County, and to provide transportation thereto under the terms of its existing contract.

312.     Due to the Oswego County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from

entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Oswego County, and is further impeded in performing its lawful preexisting contractual obligations.

*xix.* <u>*Otsego County*</u>

313.    On May 16, 2023, Otsego County declared a State of Emergency expressly in response thereto, which declares that "Otsego County is not capable of receiving and sustaining any number of migrants and/or asylum seekers. This situation threatens the public safety." *See* **Exhibit A-19**.

314.    The same day, Otsego County issued an Executive Order, which attempts to impede the transportation and temporary accommodation of Asylum Refugees in Oswego County – an unlawful and unconstitutional objective. The Otsego County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Otsego County] to transport migrants or asylum seekers to locations in [Otsego County], or to house persons at locations in [Otsego County] for any length of time without the express written permission of the County Board Chair or his designee." *Id.* The Otsego County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

315.    Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Otsego County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Otsego County is permitted to contract or otherwise engage in business with any other municipality other than the County of Otsego … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County."

73

316. The Otsego County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

317. The licensing scheme created by the Otsego County Order is arbitrary, subject to the "satisfaction" of the Otsego County's Health Department Director. *Id.*

318. The Otsego County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

319. Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Otsego County, and will provide transportation thereto under the terms of its existing contract.

320. Due to the Otsego County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary accommodations for Asylum Refugees in Otsego County, and is further impeded in performing its lawful preexisting contractual obligations.

   *xx. Schoharie County*

321. The On May 19, 2023, Schoharie County declared a State of Emergency expressly in response thereto, stating that "Schoharie County is not capable of receiving and sustaining any

number of migrants and/or asylum seekers … The situation threatens public safety." *See* **Exhibit A-20**.

322.    The same day, Schoharie County issued an Executive Order pursuant to its State of Emergency, which unlawfully and unconstitutionally attempts to impede the transportation and temporary accommodation of Asylum Refugees in Schoharie County.

323.    In furtherance of this policy objective, the Schoharie County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business with [Schoharie County] to transport migrants or asylum seekers to locations in [Schoharie County], or to house persons at locations in [Schoharie County] for any length of time without the express written permission of the County Board Chair or his designee." *Id.* The Schoharie County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

324.    Facially violating Plaintiffs' constitutional rights and mimicking several other County Executive Orders passed by Defendant Counties, the Schoharie County Order further states that "[n]o hotel, motel, owner of a multiple dwelling, or shelter in Schoharie County is permitted to contract or otherwise engage in business with any other municipality other than the County of Schoharie … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

325.    The Schoharie County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

326.    The licensing scheme created by the Schoharie County Order is arbitrary, subject to the "satisfaction" of the Schoharie County Health Department Director or her designee. *Id.*

327.    The Schoharie County Order deputizes the Sheriff's Office to "issue appearance tickets for any violations of the Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

328.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary public accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Schoharie County, and will provide transportation thereto under the terms of its existing contract.

329.    Due to the Schoharie County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Schoharie County, and is further impeded in performing its lawful preexisting contractual obligations.

xxi. *Schuyler County*

330.    On May 11, 2023, Schuyler County declared a State of Emergency and issued an Executive Order because there was "reason to believe that illegal immigrants, migrants and/or asylum seekers could be transported to Schuyler County; and there is no reason to believe that these migrants or asylum seekers will leave Schuyler County," which induces a "reasonable apprehension of the immediate danger thereof that public safety and public health is imperiled

thereby, not only for the illegal immigrants, migrants and/or asylum seekers, but also to the other affected residents of Schuyler County …" *See* **Exhibit A-21**.

331.    In an unlawful and unconstitutional attempts to impede the transportation and temporary accommodation of Asylum Refugees in Schuyler County, the Schuyler County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Schuyler County] to transport illegal immigrants, migrants and/or asylum seekers to locations in [Schuyler County], or to house such persons at locations in [Schuyler County] for any length of time without the express written permission of the County." *Id.* The Schuyler County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

332.    Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Fulton County Order further states that "[n]o hotel, short-term rental, motel, or owner of a multiple dwelling in Schuyler County is permitted to contract or otherwise engage in business with any "foreign municipality" … for the purpose of providing housing or accommodations for illegal immigrants, migrants and/or asylum seekers without a license granted by the County."

333.    The Schuyler County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

334.    The licensing scheme created by the Schuyler County Order is arbitrary, subject to the "satisfaction" of the Public Health Director of the Schuyler County Department of Health. *Id.*

335.    The Schuyler County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

336.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Schuyler County, and will provide transportation thereto under the terms of its existing contract.

337.    Due to the Schuyler County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Schuyler County, and is further impeded in performing its lawful preexisting contractual obligations.

xxii.    *Suffolk County*

338.    On May 26, 2023, Suffolk County declared a State of Emergency in response to "some municipalities … dispers[ing] and deliver[ing] asylum seekers to various counties within New York State." *See* **Exhibit A-22**.

339.    The same day, Suffolk County issued an Executive Order pursuant to its State of Emergency, which seeks to prohibit the transportation or temporary accommodation of Asylum Refugees within Suffolk County without the permission of Suffolk County in violation of the U.S. Constitution and federal and state law.

78

340.     In accord with this unlawful premise and in facial violation of Plaintiffs' constitutional rights, the Suffolk County Order prohibits any "hotel, motel, owner of a multiple dwelling, or shelter in Suffolk County" from "contract[ing] or otherwise engag[ing] in business with any other municipality … without the permission or coordination of the County of Suffolk and/or the State of New York for the purpose of providing housing or accommodations for asylum seekers." *Id.*

341.     The Suffolk County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

342.     The Suffolk County Order imposes criminal sanctions for violations thereof, deeming violation a Class B misdemeanor. *Id.*

343.     Highlighting Suffolk County's intent to prevent hotels therein from accommodating Asylum Refugees, the Suffolk County Supervisors' Association released a statement after the issuance of the Suffolk County Order stating that the federal government "need[s] to step up, stop finger-pointing, and finally, figure out how to handle this issue … [f]ix the system like we have been asking them to do for years. It should not and cannot be left to local governments to shoulder this burden, or take on the responsibility for this issue." *See 'Suffolk Exec Steve Bellone Issues Emergency Order On Migrant Housing,'* Sachem Patch (May 26, 2023), available at: https://patch.com/new-york/sachem/suffolk-exec-bellone-declares-state-emergency-migrant-housing.

344.     Emblematic of the discriminatory animus underlying the order, Ed Romaine, Town Supervisor for Brookhaven, located in Suffolk County, took to the media to declare that providing temporary accommodations for Asylum Refugees is "not our job." *Id.*

345.     Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Suffolk County, and will provide transportation thereto under the terms of its existing contract.

346.     Due to the Suffolk County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Suffolk County, and is further impeded in performing its lawful preexisting contractual obligations.

xxiii.     *Tioga County*

347.     On May 11, 2023, Tioga County declared a State of Emergency in response thereto, which states that "Tioga County is not capable of receiving or sustaining any number of migrants and/or asylum seekers … This situation threatens the public's safety." *See* **Exhibit A-23**.

348.     Tioga County issued an Executive Order pursuant to its State of Emergency which prohibits the transportation or temporary accommodation of Asylum Refugees in Tioga County without the permission of the County Legislative Chair, in violation of the U.S. Constitution and federal and state laws.

349.     In accord with this discriminatory and unlawful premise, the Tioga County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Tioga County] to transport migrants or asylum seekers to locations in [Tioga County], or to house persons at locations in [Tioga County] for any

length of time without the express written permission of the County Legislative Chair." *Id.* The Tioga County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

350.    Facially violating Plaintiffs' constitutional rights and mimicking several other County Executive Orders passed by Defendant Counties, the Tioga County Order further states that "[n]o hotel, motel, or owner of multiple dwelling in Tioga County is permitted to contract or otherwise engage in business with any other municipality other than the County of Tioga … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

351.    The Tioga County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

352.    The Tioga County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

353.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary accommodation. Plaintiff RRT has agreements with hotels located in Tioga County, and will provide transportation thereto under the terms of its existing contract.

354.     Due to the Tioga County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Tioga County, and is further impeded in performing its lawful preexisting contractual obligations.

        *xxiv.*     <u>Wyoming County</u>

355.     On May 18, 2023, Wyoming County declared a State of Emergency in response to the Humanitarian Program, which states that "Wyoming County does not have the capability to receive or sustain any number of migrants and/or asylum seekers … The situation threatens the public safety." *See* **Exhibit A-24**.

356.     On the same day, Wyoming County issued an Executive Order pursuant to its State of Emergency which prohibits the transportation or temporary accommodation of Asylum Refugees in Wyoming County without the permission of the Chairwoman of the Wyoming County Board of Supervisors, in violation of the U.S. Constitution and federal and state laws. *See id.*

357.     In accord with this discriminatory and unlawful intent, the Wyoming County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within [Wyoming County] to transport migrants or asylum seekers to locations in [Wyoming County], or to house persons at locations in [Wyoming County] for any length of time without the express written permission of the Chairwoman of the Wyoming County Board of Supervisors." *Id.* The Wyoming County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … to perform an act in violation of this subsection." *Id.*

358.    Facially violating Plaintiffs' constitutional and federal civil rights and mimicking several other County Executive Orders passed by Defendant Counties, the Wyoming County Order further states that "[n]o hotel, motel, or owner of a multiple dwelling in Wyoming County is permitted to contract or otherwise engage in business with any other municipality other than the County of Wyoming … for the purpose of providing housing or accommodations for migrants or asylum seekers without written approval granted by the County." *Id.*

359.    The Wyoming County Order targets only parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

360.    The Wyoming County Order deputizes the Sheriff to "issue appearance tickets for any violation of this Emergency Order," authorizes civil fines of up to "$2,000 per migrant/asylum seeker housed … for each day or part thereof during which such violation continues," and imposes criminal sanctions, deeming violation a Class B misdemeanor. *Id.*

361.    Explaining the pretext for the issuance of the Wyoming County Order, Wyoming County Chairwoman Rebecca Ryan stated that accommodation of Asylum Refugees in Wyoming County would pose a "grave risk to the social, health, and emergency services resources of the County." *See 'Wyoming County declares state of emergency,'* Arcade Herald (May 25, 2023), available at: https://www.arcadeherald.com/articles/wyoming-county-declares-state-of-emergency/.

362.    Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation to such places of temporary

accommodation. Plaintiff RRT has agreements with hotels located in Wyoming County, and will provide transportation thereto under the terms of its existing contract.

363.     Due to the Wyoming County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal civil rights, Plaintiff RRT is now prohibited from entering or performing its agreements to provide temporary public accommodations for Asylum Refugees in Wyoming County, and is further impeded in performing its lawful preexisting contractual obligations.

*xxv.*     *Monroe County*

364.     On May 23, 2023, Monroe County declared a State of Emergency and issued an Executive Order in response to the Humanitarian Program. *See* **Exhibit A-25**.

365.     The Monroe County Order prohibits the temporary accommodation of more than ten Asylum Refugees in Monroe County without approval of the Monroe County Department of Human Services, in violation of the U.S. Constitution and federal and state laws. *See id.*

366.     In furtherance of this unlawful policy and in facial violation of Plaintiffs' constitutional and federal civil rights, and mimicking several other County Executive Orders passed by Defendant Counties, the Monroe County Order states that "[n]o hotel, motel, shelter, or other multiple-dwelling unit, may enter into a contract with any municipality, corporation, partnership, individual, or any other entity for the purpose of providing emergency housing for more than ten (10) people in Monroe County unless and until such person or corporation has submitted [an Emergency Housing Plan] … and such Emergency Housing Plan has been approved by the Monroe County Department of Human Services" *Id.*

367.     The Monroe County Order requires government review and approval of any plan to accommodate Asylum Refugees every 30 days, or else the Order provides that approval of such plan will be revoked.

368.     The Monroe County Order, passed in response to the prospect of Plaintiff RRT orchestrating the accommodation of Asylum Refugees within Monroe County, specifically targets parties such as Plaintiff RRT and hotels who intend to enter into lawful agreements to provide temporary lodging and transportation services for Asylum Refugees.

369.     Plaintiff RRT, pursuant to its contract with New York City, is engaged in a statewide effort to identify hotels willing and able to provide temporary accommodations for Asylum Refugees, enter into agreements with such hotels for the provision of such temporary accommodations, and provide Asylum Refugees with transportation thereto. Indeed, Plaintiff RRT is in negotiations with potential hotel partners in Monroe County and the parties are poised to reach an agreement by which the hotels will provide temporary public accommodations to Asylum Refugees, and Plaintiff RRT will provide transportation thereto, under the terms of its existing contract.

370.     However, due to the Monroe County Order and its blatant violation of law and interference with Plaintiff RRT's constitutional and federal statutory civil rights, Plaintiff RRT is now prohibited from entering into its agreements with its hotel partners to provide temporary public accommodations for Asylum Refugees in Monroe County, and is further impeded in performing its lawful preexisting contractual obligations.

xxvi.     *The Town of Colonie*

371.     On May 23, 2023, Albany County declared a State of Emergency due to "the anticipated migration of migrants and/or asylum seekers into the County of Albany" and issued an

Executive Order pursuant thereto, expressly prohibiting Plaintiffs from transporting and renting to Asylum Refugees any and all rooms in all hotels, motels and all short-term rentals located in its territorial limits. *See* **Exhibit A-26**.

372.    The Albany County Order prohibits any municipality, such as New York City, from "mak[ing] contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive or his designee." *Id.* The Albany County Order makes clear that "no person or entity may act on behalf of any municipality or in performance of a municipal program … in violation of this subsection." *Id.*

373.    Facially violating Plaintiffs' rights under the U.S. Constitution and federal civil rights statutes, the Albany County Order prohibits any "hotel, motel, owner of a multiple dwelling, or shelter in Albany County" from "contact[ing] or otherwise engag[ing] in business with any other municipality other than the County of Albany … for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id.*

374.    The Albany County Order does not target any class of person other than parties such as Plaintiff Hotels who have lawfully agreed to provide temporary lodging and transportation services to Asylum Refugees.

375.    Although Albany County has not sought to enforce its Executive Order, on May 22, 2023, the Town of Colonie, located in Albany County commenced an action against Plaintiff ES Albany, among others, with a Complaint that expressly relies on the Albany County Order, seeking to effectuate its unconstitutional and discriminatory policy objectives by and through selective and pretextual enforcement of its local zoning codes. Beyond that, the Town of Colonie

conducted an unlawful warrantless entry into ES Albany's hotel, the Surestay Plus by Best Western, located in the Town of Colie and owned by Plaintiff ES Albany, demanding names and identifying information on the Asylum Refugees, in violation of basic Fourth Amendment rights. A copy of the Colonie Petition and Complaint is annexed hereto as **Exhibit M**.

376.    Colonie's Town Supervisor Peter G. Crummey did not hide his feelings about Asylum Refugees, calling them "persons of unknown health, dietary, and behavioral histories," and refusing to elaborate or explain what he meant. *See 'Colonie supervisor says NYC violated county emergency order on migrants,'* Times Union (May 23, 2023), available at: https://www.timesunion.com/news/article/colonie-supervisor-says-nyc-violated-county18122994.php.

377.    On June 9, 2023, Colonie's motion to preliminarily enjoin the transportation and temporary accommodation of Asylum Refugees within its territorial limits was denied.

378.    Should Colonie's selective discriminatory enforcement of its local laws pursuant to the Albany County Order be permitted to stand, Plaintiffs RRT and ES Albany shall be prohibited from providing temporary public accommodations to the Asylum Refugees in Colonie, and from performing their lawful preexisting obligations.

### FIRST CAUSE OF ACTION
### (The Executive Orders Violate the Contract Clause of the U.S. Constitution)

379.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

380.    Article 1, section 10, cl. 1 of the United States Constitution provides, *inter alia*, that "No State shall…pass any…Law impairing the Obligation of Contracts…".

381.    Plaintiffs have lawfully entered into lawful agreements.

382.    Defendants are state actors that have unconstitutionally interfered with and violated Plaintiffs' rights under the U.S. Constitution Contracts Clause by passing and/or enforcing laws,

including the County Executive Orders and selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes, that impermissibly impair the obligation and performance of Plaintiffs' lawful agreements.

383.   Defendant Counties' Executive Orders are unconstitutional on their face, and as applied. In addition, Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional as applied.

384.   By reason of the foregoing, Plaintiffs – and those they serve, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

385.   An actual justiciable controversy exists as between the parties concerning the validity and constitutionality of a) Defendants' Executive Orders on their face and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes.

386.   Plaintiffs are entitled to a Declaratory Judgment declaring that 1) the County Executive Orders are unconstitutional on their face and as applied and therefore void; and 2) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional.

387.   Plaintiffs have no adequate remedy at law.

388.   Plaintiffs are entitled to an injunction staying the Supreme Court Actions identified herein in all State Courts under 28 U.S.C. §§ 2283 and 1651.

389.   Plaintiffs are entitled to a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building

codes; and b) directing Defendants to cease interfering with Plaintiffs' lawful agreements and permitting Plaintiffs to perform same by making public accommodations, transportation and services available to their clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements.

390.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**(The Executive Orders and Defendants' Selective Enforcement of Local Zoning Codes**
**Violate Title II of The Civil Rights Act of 1964)**

391.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

392.    For the foregoing reasons set forth above, the Executive Orders and Defendants' selective and discriminatory prosecution and enforcement of local zoning codes violate Title II.

393.    Title II entitles all persons to – and obligates all places of public accommodation to provide – "the full and equal enjoyment of the goods, services, facilities privileges, advantages, and accommodations of any place of public accommodation … without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

394.    Plaintiff Hotels admit and stipulate that they are "place[s] of public accommodation" under Title II and that all Plaintiffs have the right and obligation to provide for the equal use and enjoyment of their hotels as places of public accommodation, free from discrimination on the basis of race, color, national origin or alienage.

395.    Defendants' Executive Orders, and Defendants' selective discriminatory prosecution and enforcement of local zoning and building codes, including Defendants' use of the

89

State Courts to obtain Orders enforcing same, violates the rights of both Plaintiff Hotels and the Asylum Refugees under Title II, including without limitation under Sections 201, 202, 203 and 204 of Title II.

396.     By reason of the foregoing, Plaintiffs – and their hotel clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

397.     By reason of the foregoing conduct by Defendants, discrimination is supported by State action in violation of Title II, as it is carried out under color of law by a) Defendants' County Executive Orders, b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes, ordinances, and regulations, and c) Defendants' use of the State Court orders enforcing same.

398.     By reason of the foregoing, Defendants, in direct violation of Section 203 of Title II, have unlawfully intimidated, threatened, coerced, and punished Plaintiffs and the Asylum Refugees, with the purpose of interfering with their rights and privileges secured by Sections 201 and 202 of Title II.

399.     Defendant Counties' Executive Orders and Defendants' selective discriminatory prosecution and enforcement of local zoning and building codes, together with Defendants' use of the State Courts to obtain TROs and preliminary injunctions to enforce contact and acts in violation of Title II, unlawfully compel Plaintiff Hotels to discriminate on the basis of "race, color … or national origin," thereby precluding Plaintiff Hotels from complying with the express requirements of Title II.

400.     Plaintiffs have no adequate remedy at law.

401.     Plaintiffs are entitled to a preliminary and permanent injunction under Section 204 of Title II enjoining Defendant Counties and Municipalities from enforcing the Executive Orders and selectively enforcing their respective local codes against Plaintiffs.

402.     Plaintiffs are entitled to reasonable attorneys' fees under Title II.

## THIRD CAUSE OF ACTION
**(The Executive Orders and Selective Discriminatory Enforcement of Zoning Codes Violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment)**

403.     Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

404.     For the foregoing reasons set forth above, Defendants' Executive Orders and Defendants' selective and discriminatory prosecution and enforcement of local zoning codes violate the due process and equal protection rights of Plaintiffs and the Asylum Refugees in violation of the Fourteenth Amendment to the Constitution.

405.     Plaintiffs enjoy Fourteenth Amendment due process rights to freely travel and transport the Asylum Refugees to places of public accommodation. In addition, the Asylum Refugees enjoy the same due process rights to travel freely to public places of accommodation, free from discrimination by State action. Moreover, the Asylum Refugees are discrete and insular minorities – as are the Plaintiff Hotels willing to service them and provide public accommodations to them without regard to race, color, national origin, alienage, and immigration status.

406.     In addition, Plaintiffs enjoy Fourteenth Amendment rights to Equal Protection under law. Plaintiffs' equal protection rights include the right to provide public accommodations to all persons without regard to color, race, nationality, alienage, creed, religion, or immigration status. The Asylum Refugees equally enjoy Fourteenth Amendment equal protection rights to service of public accommodations without regard to color, race, nationality, alienage, creed, religion, or immigration status.

407.     Defendants' County Executive Orders on their face deny Plaintiffs and the Asylum Refugees of their fundamental equal protection rights under the Fourteenth Amendment.

408.     In addition, and separately, Defendants' selective discriminatory prosecution and enforcement of otherwise facially-neutral local zoning and building codes are unconstitutional, as applied, under the Fourteenth Amendment. This includes, without limitation, Defendant Rockland County's issuance of the Closure Order, which is blatantly unlawful, forcing the Armoni to shut down indefinitely.

409.     By reason of the foregoing, Plaintiffs – and their clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

410.     An actual justiciable controversy exists as between the parties concerning the validity and constitutionality of a) Defendants' Executive Orders on their face and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes.

411.     Plaintiffs are entitled to a Declaratory Judgment declaring that 1) the County Executive Orders are unconstitutional on their face and as applied and therefore void; and 2) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional, including but not limited to selective

discriminatory enforcement of facially-neutral zoning codes by Orangetown, Newburgh, and Poughkeepsie, Salina and Colonie.

412.   Plaintiffs have no adequate remedy at law.

413.   Plaintiffs are entitled to a stay of all Supreme Court Actions in Defendant Counties and Towns under 28 U.S.C. §§ 2283 and 1651.

414.   Plaintiffs are entitled to a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements.

415.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**(The Executive Orders and Defendants' Discriminatory Selective Enforcement**
**of Local Zoning Codes Violate 42 U.S.C. § 1981)**

416.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

417.   For the foregoing reasons set forth above, Defendants, both individually and collectively, have taken actions which violate Section 1 of the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981 ("§ 1981").

418.   Section 1981 provides, *inter alia*, that "[a]ll persons … shall have the same right … to make and enforce contracts … and to the full and equal benefit of all laws and proceedings

for the security of persons and property as is enjoyed by white citizens[.]" The term "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

419. Defendants' actions and conduct set forth herein constitutes unlawful discrimination under Section 1981 as against both Plaintiffs, and Plaintiffs' clients and contracting parties, who are members of a racial minority, the Asylum Refugees, and unlawfully prohibits and interferes with Plaintiffs' rights under Section 1981 to enter into and enforce such lawful contracts as a result of prohibited discrimination. Defendants intended to discriminate – and in fact have discriminated against – on the basis of race, ethnicity, and national origin; and Defendants' discrimination concerns one of the activities enumerated in Section 1981, namely the right to make and enforce contracts.

420. By reason of the foregoing, Plaintiffs – and their clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

421. Plaintiffs have no adequate remedy at law.

422. Plaintiffs are entitled to a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements.

423.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees.

**FIFTH CAUSE OF ACTION**
**(The Executive Orders, Closure Order and Selective Enforcement of the Zoning Codes Violate the Fifth Amendment to the U.S. Constitution's Takings Clause)**

424.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

425.    For the foregoing reasons set forth above, the Executive Orders violate the Takings Clause of the Fifth Amendment, as incorporated against the States under the Fourteenth Amendment.

426.    Plaintiffs enjoy fundamental due process rights to ensure their private property shall not be taken for public use without just compensation. This includes use of governmental power to deprive Plaintiffs of the economic benefits of their properties and their lawful agreements in connection therewith.

427.    Defendant Counties' Executive Orders are unconstitutional on their face, and as applied and have denied Plaintiffs of their property without due process and without compensation, in violation of the Fifth and Fourteenth Amendments.

428.    Moreover, Defendant Counties and the Towns have engaged in discriminatory selective prosecution and enforcement of otherwise facially-neutral local zoning and building codes in violation of Plaintiffs' Fifth Amendment rights. This includes, without limitation,

Rockland County's issuance of the Closure Order, against Plaintiff Armoni hotel, compelling it to shut down indefinitely.

429.    By reason of the foregoing, Plaintiffs – and their hotel clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

430.    By reason of the foregoing, an actual justiciable controversy exists as between the parties concerning the validity and constitutionality of a) Defendants' Executive Orders on their face and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes.

431.    Plaintiffs are entitled to a Declaratory Judgment declaring that 1) the County Executive Orders are unconstitutional on their face and as applied and therefore void; and 2) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional

432.    Plaintiffs have no adequate remedy at law.

433.    Plaintiffs are entitled to a stay of all Supreme Court Actions identified herein commenced by Defendant Counties and Towns, under 28 U.S.C. §§ 2283 and 1651.

434.    Plaintiffs are entitled to a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements.

435.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION**
**(The Executive Orders and Selective Enforcement of Zoning Codes Violate**
**the Supremacy Clause and Are Preempted Under Federal Law)**

436.    Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

437.    Where Defendants, through their Executive Orders and/or their discriminatory selective prosecution and enforcement of otherwise facially-neutral local zoning and building codes, deny the Plaintiffs their federal statutory and constitutional rights to provide temporary public accommodations concerning aliens, such as Asylum Refugees, such laws, both facially and as applied, are preempted by federal immigration laws.

438.    Similarly, local laws and other regulations attempting to regulate and bar the harboring or housing of Asylum Refugees are equally preempted under the Supremacy Clause.

439.    Local authorities have no authority to interfere with the federal government's exclusive role in dictating restrictions on an alien's access to housing or public accommodations. Accordingly, by restricting Plaintiffs from providing available public accommodations to the Asylum Refugees and prohibiting the Asylum Refugees from accepting such public accommodations, Defendants thereby violate Plaintiff's rights under the Supremacy Clause and federal immigration policies, goals, and laws.

440.    The Executive Orders purport to restrict both private and public entities from transporting and offering public accommodations to the Asylum Refugees.

441.    Thus, the Executive Orders, as well as Orangetown, Newburgh, Poughkeepsie, Salina, and Colonie's selective and targeted enforcement of their zoning codes, violate the

Supremacy Clause and the U.S. Constitution and federal immigration laws and policies.

442.    By reason of the foregoing, Plaintiffs – and their clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

443.    By reason of the foregoing actual and justiciable controversy, Plaintiffs are entitled to a Declaratory Judgment declaring that the County Executive Orders are unconstitutional on their face and as applied and are therefore void.

444.    Plaintiffs are further entitled to a Declaratory Judgment declaring Orangetown's, Newburgh's, Poughkeepsie's, Salina's, and Colonie's selective and targeted enforcement of their zoning codes unconstitutional as applied.

445.    Plaintiffs have no adequate remedy at law.

446.    Plaintiffs are entitled to a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements.

## SEVENTH CAUSE OF ACTION
### (Equitable and Legal Relief Pursuant to 42 U.S.C. § 1983)

447.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

448.    As set forth above, Defendants, both individually and collectively, have taken actions which violate Plaintiffs' constitutional and civil rights, including without limitation those

guaranteed by the Contract Clause, Title II, Section 1981, and the Fourteenth, Fifth and Fourth Amendments to the U.S. Constitution.

449. The actions and conduct complained of herein occurred "under color of state law" and resulted in the deprivation of Plaintiffs' constitutional and federal statutory rights.

450. Each of Defendants has used their authority as State actors under color of State law to enforce Executive Orders, local laws, policies and customs, including but not limited to selective discriminatory prosecution and enforcement of facially-neutral local or municipal zoning and/or building codes, resulting in the denial and deprivation of the constitutional and federal statutory rights of both Plaintiffs and their hotel clients, the Asylum Refugees.

451. Each of Defendants directly participated in the establishment and/or enforcement of the aforementioned Executive Orders, local laws, policies, and customs with the intent to unlawfully discriminate and deprive Plaintiffs of their basic constitutional and federal statutory rights.

452. The aforementioned policies and customs were not enacted, enforced or applied for a proper governmental purpose.

453. By reason of the foregoing, Plaintiffs – and their clients, the Asylum Refugees – have suffered traceable harm as a direct result of Defendant Counties' Executive Orders and Defendants' discriminatory selective enforcement of local zoning laws and ordinances, as applied.

454. Plaintiffs are entitled to equitable and legal relief, pursuant to 42 U.S.C. § 1983 including equitable and legal relief, pursuant to 42 U.S.C. § 1983, including a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public

accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements; and compensatory and punitive damages in an amount to be determined at trial for past violations of Plaintiffs' constitutional rights and to reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION
**(Defendants Town of Salina, County of Onondaga, Town of Newburgh, County of Orange, Rockland County, Town of Orangetown and Town of Colonie Violated Plaintiffs' Fourth Amendment Rights)**

455.    Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

456.    Certain Defendants, have under color of State law, unlawfully entered and searched certain Plaintiffs' hotels, without a warrant issued by a magistrate upon probable cause, in violation of Plaintiffs' rights under the Fourth Amendment of the Constitution. Furthermore, Defendants have made these warrantless unlawful entries and inspections of Plaintiffs' properties and hotels to further Defendants' unconstitutional and unlawful scheme designed to prohibit Plaintiffs from making their public accommodations available to their hotel clients, the Asylum Refugees, as required under Title II, Section 1981, the Fourteenth Amendment Due Process and Equal Protection Clauses, and the Supremacy Clause.

457.    On June 14, 2023, Defendants Town of Salina and County of Onondaga conducted warrantless entry and searches in violation of fundamental Fourth Amendment rights of hotel Candlewood Suites, owned by Plaintiff CWP Syracuse I LLC. Defendant Salina also conducted a warrantless search and entry of the Candlewood Suites on May 22, 2023.

458.    Defendant Town of Newburgh working in coordination with the County of Orange conducted warrantless entry and searches of Plaintiff hotel Crossroads, in violation of fundamental

100

Fourth Amendment rights of its owners and operators, Plaintiffs Newburgh EOM LLC and AIMS Newburgh Management LLC.

459.    Defendants Rockland County and Town of Orangetown conducted warrantless entry and searches of hotel Armoni leased and operated by Plaintiffs Palisades Estates and AIMS Orangeburg, in violation of those Plaintiffs' Fourth Amendment rights.

460.    Defendant Town of Colonie conducted warrantless entry and searches of hotel Surestay Plus by Best Western owned by Plaintiff ES Albany.

461.    By reason of the foregoing, Plaintiffs CWP Syracuse I LLC, Newburgh EOM LLC, AIMS Newburgh Management LLC, Palisades Estates, AIMS Orangeburg and ES Albany – and their hotel clients, the Asylum Refugees – have suffered traceable harm as a direct result of these Defendants' warrantless searches and entries.

462.    Plaintiffs are entitled to damages in an amount to be proven at trial for past violations of their constitutional rights and to reasonable attorneys' fees.

463.    In addition, Plaintiffs are entitled to a preliminary and permanent injunction enjoining and restraining Defendants from entering or inspecting or searching Plaintiffs' hotels without a warrant issued upon probable cause by a court of competent jurisdiction in a proceeding upon Notice with a right to be heard by Plaintiffs prior to issuance of any warrant.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

a)      On the First Cause of Action, 1) a Declaratory Judgment declaring that a) the County Executive Orders are unconstitutional on their face and as applied, in violation of the U.S. Constitution Contract Clause, Article 1, Section 10, cl. 1; and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional and violates the U.S. Constitution Contract Clause, Article 1, Section 10, cl. 1; 2) an injunction staying the Defendants' Supreme Court Actions under 28 U.S.C. §§ 2283 and 1651; and 3) preliminary and permanent injunction a) enjoining and

restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to cease interfering with Plaintiffs' lawful agreements and permitting Plaintiffs to perform same by making public accommodations, transportation and services available to their hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements;

b)      On the Second Cause of Action, a preliminary and permanent injunction under Section 204 of Title II enjoining Defendant Counties and Municipalities from enforcing the Executive Orders and selectively enforcing their respective local codes against Plaintiffs and reasonable attorneys' fees and costs under Title II;

c)      On the Third Cause of Action, 1) a Declaratory Judgment that a) the County Executive Orders are unconstitutional on their face and as applied under the Fourteenth Amendment Equal Protection and Due Process Clauses; and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional under the Fourteenth Amendment equal protection and due process clauses, including but not limited to selective discriminatory enforcement of facially-neutral zoning codes by Orangetown, Newburgh, and Poughkeepsie, Salina and Colonie; and 2) an injunction staying all Supreme Court Actions in Defendant Counties and Towns under 28 U.S.C. §§ 2283 and 1651; and 3) a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements;

d)      On the Fourth Cause of Action, a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements; and compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees;

e)      On the Fifth Cause of Action, 1) a Declaratory Judgment declaring that a) the County Executive Orders are unconstitutional on their face and as applied; and b) Defendants' selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes is unconstitutional; 2) an injunction staying all Supreme Court Actions identified herein commenced by Defendant Counties and Towns, under 28 U.S.C. §§ 2283 and 1651; 3) a

preliminary and permanent injunction a) enjoining and restraining the Defendants from i) enforcing the Executive Orders; and ii) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements; and 4) compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees;

f)      On the Sixth Cause of Action, a Declaratory Judgment declaring that the County Executive Orders are unconstitutional on their face and as applied; and that Orangetown's, Newburgh's, Poughkeepsie's, Salina's, and Colonie's selective and discriminatory enforcement of their zoning codes is unconstitutional as applied;

g)      On the Seventh Cause of Action, equitable and legal relief, pursuant to 42 U.S.C. § 1983, including a preliminary and permanent injunction a) enjoining and restraining the Defendants from 1) enforcing the Executive Orders; and 2) selective discriminatory prosecution and enforcement of facially-neutral local town or municipal zoning and/or building codes; and b) directing Defendants to make public accommodations, transportation and services available to Plaintiffs' hotel clients, the Asylum Refugees, at the sole cost of New York City, as provided for in Plaintiffs' agreements; and compensatory and punitive damages in an amount to be determined at trial for past violations of their constitutional rights and to reasonable attorneys' fees;

h)      On the Eighth Cause of Action, damages in an amount to be proven at trial for past violations of their Fourth Amendment constitutional rights and to reasonable attorneys' fees and costs; and a preliminary and permanent injunction enjoining and restraining Defendants from entering or inspecting or searching Plaintiffs' hotels without a warrant issued upon probable cause by a court of competent jurisdiction in a proceeding upon Notice with a right to be heard by Plaintiffs prior to issuance of any warrant;

i)      Plaintiffs' costs and reasonable attorneys' fees in this action; and

k)      such other and further relief as this Court deems just and proper.

Dated: New York, New York
       July 10, 2023

                                        **PRYOR CASHMAN LLP**

                                        By:
                                        Todd E. Soloway, Esq.
                                        Perry M. Amsellem, Esq.
                                        Todd B. Marcus, Esq.
                                        Itai Y. Raz, Esq.
                                        7 Times Square
                                        New York, New York 10036-6569
                                        (212) 421-4100
                                        *Attorneys for Plaintiffs*